Robert WALCZAK and Karen Walczak, Plaintiffs–Appellees,

v.

**FLORIDA UNION FREE SCHOOL DISTRICT and Maureen Flaherty, Defendants–Appellants.**

No. 97–7155.

United States Court of Appeals, Second Circuit.

Argued Nov. 3, 1997.

Decided April 16, 1998.

Michael H. Sussman (Sussman, Bergstein & Wotorson, Goshen, NY), for Plaintiffs–Appellees.

Frederick B. Simpson, (Ahmuty, Demers & McManus, Albertson, NY, Frederick B. Simpson, Janice Berkowitz, and Brendan T. Fitzpatrick on briefs), for Defendants–Appellants.

Before: OAKES, PARKER, Circuit Judges, RAGGI, District Judge.[1]

RAGGI, District Judge:

At issue in this case is the 1995–96 educational plan and placement proposed for B.W., a learning disabled child. The Florida Union Free School District, located in Orange County, New York, and Maureen Flaherty, its Superintendent of Schools (hereafter collectively referred to as "the School District"), proposed to educate B.W. in a day program for the developmentally disabled at the Orange and Ulster Counties Board of Cooperative Education Services ("BOCES"). The child's parents, Robert and Karen Walczak, disagreed with this placement and independently enrolled their then twelve-year old daughter in a full-time residential program at Maplebrook, a nearby private school for the learning disabled. After unsuccessfully challenging the School District's proposed placement in two administrative proceedings, the Walczaks filed suit in the Southern District of New York pursuant to the Individuals with Disabilities Education Act ("IDEA"), 20 U.S.C. §§ 1401 *et seq.* (1990 & Supp. 1998), seeking (1) a declaration that the BOCES program was inadequate to provide their child with an appropriate education, (2) a declaration that Maplebrook was an appropriate placement, and (3) reimbursement of expenses incurred at Maplebrook.

The School District now appeals from an order of Judge Charles L. Brieant denying its motion for summary judgment and entering judgment in favor of the Walczaks. It contends that the district court's finding that the BOCES program was inadequate to permit B.W. to make meaningful educational progress is not supported by the extensive record of administrative proceedings in this case. This court agrees. Because a preponderance of the evidence establishes the adequacy of the proposed placement, we reverse the judgment of the district court and remand the case.

### Background

To resolve the issue presented on this appeal, the court must first review (1) the

---

1. The Honorable Reena Raggi of the United States District Court for the Eastern District of New York, sitting by designation.

basic requirements of IDEA, (2) the means by which New York State endeavors to comply with these requirements, (3) the individualized education program ("IEP") for B.W. that is challenged in this case, and (4) the record of proceedings before the district court.

## 1. *IDEA*

IDEA is the most recent Congressional enactment in "an ambitious federal effort to promote the education of handicapped children." *Board of Educ. v. Rowley*, 458 U.S. 176, 179, 102 S.Ct. 3034, 73 L.Ed.2d 690 (1982) (interpreting the Education for All Handicapped Children Act, subsequently amended and renamed IDEA). Toward that end, Congress provides federal funds to those states that develop plans to assure "all children with disabilities the right to a free appropriate public education." 20 U.S.C. § 1412(1); *see Board of Educ. v. Rowley*, 458 U.S. at 181, 102 S.Ct. at 3037–38. The "free appropriate public education" mandated by federal law must include "special education and related services" tailored to meet the unique needs of a particular child, 20 U.S.C. § 1401(a)(18), and be "reasonably calculated to enable the child to receive educational benefits," *Board of Educ. v. Rowley*, 458 U.S. at 207, 102 S.Ct. at 3051.

Because the law expresses a strong preference for children with disabilities to be educated, "to the maximum extent appropriate," together with their non-disabled peers, 20 U.S.C. § 1412(5), special education and related services must be provided in the least restrictive setting consistent with a child's needs. Only "when the nature or severity" of a child's disability is such "that education in regular classes with the use of supplementary aids and services cannot be achieved satisfactorily" should a child be segregated. *Id.* In such cases, instruction may be provided not only in special classrooms but also "in the home, in hospitals and institutions, and in other settings." 20 U.S.C. § 1401(a)(16). Indeed, a school board may be required to place a child in a residential institution if such a placement is necessary to provide an appropriate education. *See* 34 C.F.R.

§ 300.302 (1998); *Mrs. B. v. Milford Bd. Of Educ.*, 103 F.3d 1114, 1122 (2d Cir.1997).

The particular educational needs of a disabled child and the services required to meet those needs must be set forth at least annually in a written IEP. *See* 20 U.S.C. § 1414(a)(5). An IEP must state (1) the child's present level of educational performance; (2) the annual goals for the child, including short-term instructional objectives; (3) the specific educational services to be provided to the child, and the extent to which the child will be able to participate in regular educational programs; (4) the transition services needed for a child as he or she begins to leave a school setting; (5) the projected initiation date and duration for proposed services; and (6) objective criteria and evaluation procedures and schedules for determining, on at least an annual basis, whether instructional objectives are being achieved. *See* 20 U.S.C. § 1401(a)(20). A school official qualified in special education, the child's teacher, the child's parents, and, where appropriate, the child, all participate in the development of an IEP. *See id.*

Parents who are dissatisfied with a proposed IEP may file a complaint with the state educational agency. *See* 20 U.S.C. § 1415(b)(1)(E). Complaints are resolved through an "impartial due process hearing," 20 U.S.C. § 1415(b)(2), at which school authorities have the burden of supporting the proposed IEP, *see Matter of the Application of a Handicapped Child*, 22 Educ. Dep't Rep. 487, 489 (1983) ("It is well established that a board of education has the burden of establishing the appropriateness of the placement recommended by [the school board]"); *see also Application of a Child Suspected of Having a Disability*, N.Y. State Educ. Dep't Appeal No. 93–9 (Mar. 29, 1993); *Application of a Child with a Handicapping Condition*, N.Y. State Educ. Dep't Appeal No. 92–7 (Mar. 5, 1992). A local hearing officer's decision may be appealed to the state educational agency, *see* 20 U.S.C. § 1415(c), after which any party still aggrieved may sue in either state or federal court, *see* 20 U.S.C. § 1415(e)(2). A court will fashion appropriate relief based on its assessment of a preponderance of the evidence developed at the

administrative proceedings and any further evidence presented by the parties. *Id.*

### 2. *New York's Regulatory Scheme*

Since New York State receives federal funds under IDEA, it is obliged to comply with the requirements of this law. To meet these obligations and to implement its own policies regarding the education of disabled children, the State has assigned responsibility for developing appropriate IEPs to local Committees on Special Education ("CSE"), the members of which are appointed by school boards or the trustees of school districts. *See* N.Y. Educ. Law § 4402(1)(b)(1) (McKinney Supp.1997–98); *Heldman v. Sobol*, 962 F.2d 148, 152 (2d Cir.1992). In developing a particular child's IEP, a CSE is required to consider four factors: (1) academic achievement and learning characteristics, (2) social development, (3) physical development, and (4) managerial or behavioral needs. *See* 8 N.Y.C.R.R. § 200.1(kk)(2)(i) (1997).

New York further requires that each child's IEP identify a specific class placement. *See* 8 N.Y.C.R.R. § 200.4(c)(2)(ix). Children may be grouped together in a special education class if they have "the same disabilities" or if they have "differing disabilities [but] ... similar individual needs for the purpose of being provided a special education program." 8 N.Y.C.R.R. § 200.1(jj); *see also* 8 N.Y.C.R.R. § 200.6(g)(3). Thus, the students in a class must have sufficiently similar academic levels and learning characteristics that each child will have the opportunity to achieve his or her annual goals. *See* 8 N.Y.C.R.R. § 200.6(a)(3)(i). A CSE must also strive to "assure that the social interaction within the group is beneficial to each student, contributes to each student's social growth and maturity, and does not consistently interfere with the instruction being provided." 8 N.Y.C.R.R. § 200.6(a)(3)(ii). Nevertheless, the regulation cautions that the "social needs of a student shall not be the sole determinant" of his or her class placement. *See id.* Similarly, the management needs of the students in a class group may vary, provided that no student unduly interferes with the ability of others to learn. *See*

8 N.Y.C.R.R. § 200.6(a)(3)(iv). Children whose disabilities do present particular management concerns are grouped in smaller-than-average size classes of six, eight, or twelve students, depending on the degree of intervention required. *See* 8 N.Y.C.R.R. § 200.6(g)(4).

### 3. *The Challenged 1995–96 IEP*

The challenged 1995–96 IEP provided for B.W. to be educated in a year-round BOCES day program for the developmentally disabled. There would be twelve children in her class, taught by one teacher with the assistance of one teacher's aide. In addition, B.W. would receive four 30–minute sessions of speech therapy each week, three times in a group of up to five children and once by herself. She would also participate in a 30–minute group counseling session once per week.

The Walczaks disagreed with this proposal, contending that their daughter's needs could not be met in a day program and that she required a residential placement. Alternatively, they challenged the size and composition of the proposed BOCES class.

The Walczaks' objections triggered an independent administrative review of the proposed IEP. Administrative officers at both the local and state level upheld the BOCES placement. In ruling otherwise, the district court conclusorily adopted the Walczaks' arguments that the administrative proceedings did not delve sufficiently into B.W.'s classroom performance and that the School District had not shown that the BOCES placement was adequate to permit B.W. to make educational and social progress. *See Walczak v. Florida Union Free Sch. Dist.*, No. 96 Civ. 1634(CLB) (S.D.N.Y. Dec. 23, 1996). In fact, the record developed at the administrative proceedings was exhaustive, and both the local and state reviewing officers carefully analyzed all relevant materials in ruling in favor of the School District. This court is obliged to review that record to explain why the district court's ruling must be reversed.

### 4. *The Record Before the District Court*

#### a. *The Independent Evidentiary Hearing*

Over the course of six days in May and June 1995, the local independent hearing offi-

cer took testimony from eight witnesses: (1) Elaine Flynn, the Interim Chairman of the School District's CSE; (2) Frank Jordan, a School District psychologist; (3) Louise Baines, the Supervisor of the BOCES program for the developmentally disabled; (4) Charles Entress, the Interim Director of the School District's Department of Special Education; (5) Margaret Napolitano, B.W.'s most recent classroom teacher at BOCES; (6) Jennifer Makower, B.W.'s speech therapist at BOCES; (7) Dr. Phoebe Liss, a psychologist who had evaluated B.W. on a number of occasions at the request of her parents; and (8) Barbara Priestner–Werte, a psychotherapist who had privately counseled B.W. once a week during the period 1992–95. It also reviewed voluminous documentary evidence, including virtually every school report and professional evaluation of B.W. since she had entered kindergarten.

In summarizing this material, we begin with the documentary record of B.W.'s educational history and then proceed to the testimony before the hearing officer.

### (1) The Original Classification of B.W. as Learning Disabled

B.W. was five years old and enrolled in a regular kindergarten class in the School District's Golden Hill elementary School when her learning difficulties first became apparent. Examining neurologists and psychiatrists identified a host of possible disabilities, including Minimal Brain Dysfunction syndrome with an attention deficit disorder and hyperactivity, developmental language disorder, a mild to moderate separation anxiety disorder, and obsessive compulsive disorder, and Tourette's Syndrome. About this same time, B.W. was first examined by educational psychologist, Dr. Phoebe Liss. She determined that B.W. had a low-to-normal IQ of 81, a limited attention span, a poor vocabulary, and an inability to follow simple directions or to express herself in complete sentences.

The doctors uniformly recommended that B.W. be classified as learning disabled and that a specialized education program be developed for her with emphasis on language and occupational therapy. The School District agreed and proposed that in the 1989-90 school year, B.W. be placed in a BOCES special education class with supplemental special services.

### (2) B.W.'s Placement at Bishop Dunn

Instead of enrolling B.W. at BOCES, the Walczaks opted to place their daughter, at their own expense, in the Bishop Dunn Memorial School, a private school for children with learning disabilities. There, B.W. was in a self-contained special education class for most of her studies, but mainstreamed for others.

In May 1992, the School District reviewed B.W.'s progress. The results were very disappointing. The nine-year old child's reading skills were at the first-grade level. Her math skills were even poorer. Most disturbingly, her IQ measured 55, significantly lower than in 1989. The Walczaks asked Dr. Liss to reevaluate B.W. She confirmed B.W.'s poor progress in reading and math but found the child's IQ to be 70 rather than 55. Dr. Liss recommended that B.W. be placed in a self-contained special education class and that she be provided with occupational and speech therapy and counseling.

Several months later, B.W. was examined by yet another neurologist and child psychiatrist. They were the first to suggest that she had pervasive developmental disorder, which was described as a "global neurological disturbance," consistent with B.W.'s various cognitive, intellectual, and language deficits, as well as the panoply of behavioral and social problems she presented, including "perseverations, obsessions, volatility, magical thinking, variable relatedness, insistence on sameness, insensitivity to other people's feelings, and ignorance of basic social rules and conventions, and a lack of empathy with other people."

### (3) B.W.'s Placement in BOCES

In the summer of 1993, the Walczaks finally accepted the School District's recommendation that their daughter be educated at BOCES. She was enrolled in a twelve-student intermediate level class and provided with additional group counseling, individual

occupational therapy, and group and individual speech therapy.

BOCES' teachers monitored B.W.'s progress in detailed quarterly reports. These indicate that throughout her first year at BOCES, B.W. required constant teacher supervision simply to focus her attention on her assignments. She was frequently disruptive and displayed various obsessive/compulsive traits that adversely affected her ability to interact with others. Nevertheless, at the end of the first year, her classroom teacher, Ms. Bloom, reported concrete progress in several areas. Most notably, B.W. was reading at the late second-grade level. She could identify the number of syllables in a word, perform basic grammar exercises, and write two to three related sentences on an assigned topic. In mathematics, B.W. could perform simple addition and subtraction and had successfully completed a unit on telling time. Ms. Bloom cautioned, however, that B.W.'s day-to-day performance could vary significantly because of continuing problems with focus and behavior.

In the summer of 1994, the Walczaks voluntarily withdrew B.W. from BOCES for four weeks so that she could attend a residential camp for disabled children. They are convinced that their daughter's social skills benefitted tremendously from this experience, but the record evidence on this point is essentially conclusory and second hand. Apparently, no significant social progress was evident to B.W.'s teachers when the child returned to BOCES. In her fall 1994 report, classroom teacher Margaret Napolitano noted that B.W. still did not respond to efforts to encourage interaction with her classmates. As for B.W.'s academic performance, Ms. Napolitano reported that she was reading at the mid-second-grade level, but her progress was only fair. B.W.'s performance in science and social studies was erratic due to problems with comprehension and behavior. By contrast, her effort and participation in third-grade level math was described as excellent. Ms. Napolitano's mid-year report showed B.W. to be continuing to work at these levels.

*(4) Developing the 1995–96 IEP*

By the 1995–96 term, when B.W. turned twelve, she would outgrow the BOCES inter-

mediate program. Students functioning at her academic level generally moved into the BOCES developmentally disabled program. There, they were encouraged to apply academic lessons to practical tasks such as letter writing, shopping, simple cooking, using money, and getting along with people. Once these students turned fourteen, the developmentally disabled program provided them with specific vocational training.

The Walczaks, however, were not satisfied with the BOCES developmentally disabled program. In a January 27, 1995 letter to CSE Chairperson Elaine Flynn, they explained that they wished "to obtain the maximum interventions in [B.W.'s] self development so that she can reach her true potential." They thought this could best be achieved through B.W.'s placement in a full-time residential program, specifically, the one available at Maplebrook, a private school for the learning disabled in Amenia, New York.

In anticipation of the annual CSE review to determine B.W.'s 1995–96 placement, the Walczaks again had their daughter evaluated by Dr. Liss. In her January 1995 report, Dr. Liss noted a "startling" improvement in B.W.'s behavior since her last examination in 1992. Whereas B.W. had previously exhibited "idiosyncratic, inappropriate, and obsessive behavior," and could not "maintain conversational exchanges even in a controlled one-on-one basis," she was now "a far more appropriate person, capable of following rules, and more aware of her surroundings." The doctor also noted B.W.'s academic progress since her last evaluation. Her reading scores were at the high second-grade level, to mid-third-grade level. Her mathematics skills also tested at the second-grade level.

Despite this progress, Dr. Liss recommended against B.W.'s continued placement at BOCES or in *any* day program. She stated that B.W. needed to be placed in a residential facility such as Maplebrook where she would have around-the-clock reenforcement of appropriate behavior and constant interaction with peers.

About this same time, School District psychologist Frank Jordan also evaluated B.W. He agreed that B.W. "need[ed] a specialized program and a supportive nurturing environment in order to have the best chance at learning." He did not, however, conclude that these needs could only be met in a residential program.

The School Board CSE met on February 14, 1995 to consider B.W.'s IEP for the following year. The Walczaks were present, as were a number of teachers and experts who had evaluated or worked with B.W. While there was general agreement that B.W. had made considerable academic and social progress during her two years at BOCES, all parties recognized that one social problem persisted: B.W.'s refusal to interact with other children. the Walczaks urged a residential placement as the best means to address this problem. CSE Chairman Flynn opposed this request because she considered a residential placement unnecessarily restrictive to address B.W.'s academic and social needs. The CSE concurred and proposed in its IEP that B.W. be educated in the BOCES day program for the developmentally disabled.

On February 16, 1995, the Walczaks formally challenged this 1995–96 IEP and requested a hearing. A postponement was granted to allow the School District to correct an acknowledged defect in the IEP: its failure to identify a specific class grouping for B.W. at BOCES. Ultimately, the CSE proposed that she be placed in the higher functioning of two developmentally disabled classes that would be established in 1995–96 for children her age. The children in that group had IQ scores that generally ranged from 63 to 90. Only one child, with a score of 46, was significantly lower. B.W.'s most recent IQ scores—72 when tested by Dr. Liss; 65 when tested by Mr. Jordan—placed her in the middle of this group. The reading scores for the group ranged from below kindergarten to fourth grade. B.W.'s reading level of high second to low third grade placed her at the high end of this group, with four other students in her range. The group's mathematics performance ranged from first grade to high third grade. B.W. had tested in the second-grade to third-grade range in mathematics, which was again consistent with four of the other children. The results of a social skills inventory showed that B.W. ranked at the bottom of the proposed grouping in terms of her social skills and at the top in terms of behavior.

### (5) Testimony at the Administrative Hearing

Each witness who testified at the administrative hearing acknowledged that B.W. had made both academic and social progress in the years 1993–95, the period when she was enrolled at BOCES. They disagreed, however, as to whether the BOCES program had contributed to this progress and whether it could adequately address B.W.'s continuing needs.

B.W.'s speech teacher, Ms. Makower, testified that when the child first entered BOCES, her inappropriate behavior and lack of focus made it difficult to teach her anything. Over two years, BOCES teachers worked to help reduce this problem. As a result, Ms. Makower had been able to help B.W. improve the intelligibility of her speech and her ability to follow directions. Classroom teacher Margaret Napolitano similarly testified that B.W. was now less disruptive in class and increasingly able to complete academic assignments without constant teacher intervention. Ms. Napolitano acknowledged B.W.'s continuing social problems, particularly her resistance to interaction with other children. Nevertheless, she supported the proposed BOCES placement because she viewed the academic and social goals set in the 1995–96 IEP as entirely realistic for B.W. Indeed, because she had seen B.W. make progress in both these areas in her own class of twelve students, she thought that the child could continue to be successful in a class of that size.

Ms. Flynn, Mr. Jordan, and Louise Baines, the Supervisor of the developmentally disabled program, also testified in support of the proposed IEP. Ms. Flynn explained that the BOCES developmentally disabled program was specifically designed to encourage students like B.W. to develop appropriate social skills without the unnecessary restric-

tions of a residential placement. Mr. Jordan agreed that the program's emphasis on practical life skills would routinely require B.W. to interact with other children while providing her with the strong structure, support, and supervision that she needed to succeed. Ms. Baines was even more emphatic, testifying that social skills were emphasized "100% of the time" in the developmentally disabled program.

Both Dr. Liss and B.W.'s psychotherapist, Ms. Priestner–Werte, nevertheless, testified in favor of placing B.W. in a residential facility such as Maplebrook. While neither witness questioned the academic and social goals set for B.W. in the proposed IEP, Dr. Liss insisted that B.W. could only achieve the outlined social goals in a residential facility. Ms. Priestner–Werte, on the other hand, testified that, although she favored a residential placement because of the intensity and consistency afforded by a such a program, she did think that B.W.'s social and academic needs could be met in the BOCES developmentally disabled program.

### (6) The Hearing Officer's Decision

On September 28, 1995, the hearing officer issued a fourteen-page decision in favor of the School District. After carefully reviewing the evidence developed at the hearing, he noted that the parties' primary dispute focused on whether B.W. could receive an appropriate education in the BOCES day program or whether she needed to be placed in a residential facility. In finding that the School District had carried its burden of establishing the appropriateness of the BOCES placement, the hearing officer relied on Ms. Napolitano's testimony that the academic components of the 1995–96 IEP were realistic, and on Ms. Priestner–Werte's testimony that BOCES could meet the child's educational and social needs. He further credited the testimony of those witnesses who indicated that the proposed class grouping would place B.W. with children who

would be appropriate social companions for her.

The hearing officer acknowledged that a residential facility such as Maplebrook might afford B.W. even more opportunities for social interaction than the BOCES day program, and that this might increase the chance of improving the child's social skills. This single factor, however, was insufficient to persuade him that the proposed day program was inadequate. Citing to this court's decision in *Tucker v. Bay Shore Union Free Sch. Dist.*, 873 F.2d 563, 567 (2d Cir.1989),[2] the hearing officer explained that, while the proposed IEP might not provide everything sought by loving parents, it was nevertheless "reasonably calculated to provide educational benefits for the child." Accordingly, the IEP was upheld.

### b. *The Appeal to the State Education Department*

Sometime after the conclusion of the 1994–95 school term, the Walczaks removed B.W. from the BOCES program and enrolled her at Maplebrook. They appealed the hearing officer's decision in favor of the School District to the New York State Education Department and sought reimbursement for their expenses at Maplebrook. On December 15, 1995, a state review officer upheld the proposed BOCES placement.

In a single-spaced eleven-page decision, the review officer meticulously reviewed the evidence developed in the administrative hearing. Preliminarily, he found that the proposed IEP adequately described B.W.'s academic and social needs and provided reasonable annual goals and short-term instructional objectives to meet those needs. Considering the propriety of the BOCES placement, the review officer specifically rejected the Walczaks' argument that "inherent limitations" in the BOCES program had prevented B.W. from making anything but slight academic and social progress in her years there. He noted that BOCES used a

---

**2.** In *Tucker,* this court held that the parents of a handicapped child could not obtain reimbursement from the school district for their unilateral placement of their child in a private school that was not "approved" by the state education com-

missioner. *See* 873 F.2d at 568. The Supreme Court subsequently ruled otherwise in *Florence County Sch. Dist. Four v. Carter,* 510 U.S. 7, 114 S.Ct. 361, 126 L.Ed.2d 284 (1993).

multisensory instructional approach, which all witnesses had recognized as best suited to B.W.'s particular needs. He further cited to the reports of B.W.'s two classroom teachers indicating that the child had advanced academically at BOCES to the point where she could work at the second-grade to third-grade level. To the extent that B.W.'s progress was sometimes slow and inconsistent, the review officer held that this was more reflective of the nature and extent of the child's disabilities than of any inherent inadequacy in the BOCES program. He found no support in the record for the claims that the BOCES staff was not trained to work together or that B.W. needed to be in a smaller class to make reasonable progress.

As to the contention that B.W. had made only slight social progress while at BOCES, the review officer cited to Dr. Liss's observation of "remarkable" improvement in the child's social skills between 1992 and 1995. To the extent Dr. Liss had also testified that B.W. could not make further social progress in a day program, the officer rejected this opinion, noting that Dr. Liss had not explained why the skills she deemed important—learning to live with others, take turns, say how she feels, smile at the appropriate time—could not be developed in a non-residential program. He observed that although Ms. Priestner–Werte considered a residential placement preferable, she had testified that the BOCES program could meet B.W.'s educational and social needs. Thus, he found no basis in the record for concluding that a highly restrictive residential placement was necessary for B.W. to make reasonable educational progress.

The review officer also rejected the Walczaks' challenge to the class grouping proposed for B.W. Relying on the class profile received into evidence, as well as the testimony of Ms. Flynn and Ms. Baines, he found that the children's academic, social, physical, and management needs were sufficiently similar for them to be educated together.

## 5. The Summary Judgment Motion Before the District Court

The Walczaks next challenged the IEP by filing this IDEA action in federal court. The School District moved for summary judgment relying on the administrative record. In opposing this motion, the Walczaks disputed the School District's assessment of that record and sought to supplement it with materials relating to B.W.'s progress after a year at Maplebrook. These materials suggest that B.W. made acceptable, if not dramatic, academic progress at Maplebrook. Her social progress was more significant. B.W. began to establish friendships with other children and to participate in group activities. Dr. Liss reported that B.W.'s "living skills" had also improved from the level of a five-year old to those of a nine-year old. Still, Maplebrook teachers continued to observe problems that had long afflicted B.W., notably, her difficulty with focus and inappropriate verbal and physical peer contact.

Based on its own review of the administrative record, as well as these supplemental submissions, the district court denied the School District's motion for summary judgment and, *sua sponte*, entered judgment in favor of the Walczaks. In so ruling, the court made only general factual findings without referring to the specific evidence in the record. It held simply that

The administrative proceedings in this case, on careful review, reveal that the school district did not show within the first criterion of the *Burlington* test[3]—that the services offered by the school district were adequate or appropriate. The testimony adduced at the hearing establishes by a clear preponderance of the evidence "that the inherent limitations in the BOCES' program make it impossible for B.W. to adequately advance, educationally or socially, through the program offered." [Parents' Post–Trial Brief at 10, 8/24/95]. According to the records provided, the BOCES staff is not trained to work closely together and does not [do] so; B.W. needs a smaller group setting than that proposed by BOCES in order to learn; the BOCES

---

**3.** The standard set forth by the Supreme Court in *School Comm. of Burlington v. Department of* *Educ. of Mass.*, 471 U.S. 359, 105 S.Ct. 1996, 85 L.Ed.2d 385 (1985) is discussed *infra*.

program operates only during the day, while B.W. needs a more structured environment around the clock, "replete with opportunities for social engagement with other children;" and that B.W. needs a specialized program and a supportive nurturing educational environment in order to learn in the most effective way. *Id.* at 11. As to the other two standards set by the *Burlington* Court, the plaintiffs clearly have met these requirements, proving through the Maplebrook School's teachers and administrators that the services selected by the parents were appropriate and that equitable considerations favor the parents['] claim.

*Walczak v. Florida Union Free Sch. Dist.,* No. 96 Civ. 1634, at 6–7.

### Discussion

I. *The Standard of Judicial Review in IDEA Cases*

█ When the parents of a disabled child file suit under IDEA to challenge a state-proposed IEP and when the relief they seek includes reimbursement of expenses incurred at a private school, an award will be entered in their favor if it appears (1) that the proposed IEP was inadequate to afford the child an appropriate public education, and (2) that the private education services obtained by the parents were appropriate to the child's needs. *See School Comm. of Burlington v. Department of Educ. of Mass.,* 471 U.S. 359, 370, 105 S.Ct. 1996, 2002–03, 85 L.Ed.2d 385 (1985); *accord Florence County Sch. Dist. Four v. Carter,* 510 U.S. 7, 12–14, 114 S.Ct. 361, 364–66, 126 L.Ed.2d 284 (1993) (where both prongs of *Burlington* test are satisfied, court may require state to reimburse parents for expenses incurred at a private school even though it is not on state-approved placement list); *Still v. DeBuono,* 101 F.3d 888, 891 (2d Cir.1996). In this case, the parties' dispute focuses only on the first factor, *i.e.,* the adequacy of the 1995–96 IEP proposed for B.W.

█ The responsibility for determining whether a challenged IEP will provide a child with an appropriate public education rests in the first instance with administrative hearing and review officers. Their rulings are then subject to "independent" judicial review. *Board of Educ. v. Rowley,* 458 U.S. at 205, 102 S.Ct. at 3050 (quoting S. Conf. Rep. No. 94–455, at 50 (1975), *reprinted in* 1975 U.S. Code Cong. & Admin. News 1480, 1503). The Supreme Court has cautioned, however, that this "independent" review "is by no means an invitation to the courts to substitute their own notions of sound educational policy for those of the school authorities they review." *Id.* at 206, 102 S.Ct. at 3051. While federal courts do not simply rubber stamp administrative decisions, they are expected to give "due weight" to these proceedings, mindful that the judiciary generally "lack[s] the 'specialized knowledge and experience' necessary to resolve 'persistent and difficult questions of educational policy.'" *Id.* at 206, 208, 102 S.Ct. at 3050–51, 3052 (quoting *San Antonio Indep. Sch. Dist. v. Rodriguez,* 411 U.S. 1, 42, 93 S.Ct. 1278, 1301–02, 36 L.Ed.2d 16 (1973)); *accord Mrs. B. v. Milford Bd. of Educ.,* 103 F.3d at 1120; *Garro v. State of Connecticut,* 23 F.3d 734, 736 (2d Cir.1994). Deference is particularly appropriate when, as here, the state hearing officers' review has been thorough and careful.

█ Two issues are relevant to a federal court's review of a challenged IEP: (1) whether the state complied with the procedural requirements of IDEA, and (2) whether the challenged IEP was "reasonably calculated to enable the child to receive educational benefits." *Board of Educ. v. Rowley,* 458 U.S. at 206–07, 102 S.Ct. at 3051; *accord Mrs. B. v. Milford Bd. of Educ.,* 103 F.3d at 1120.

The initial procedural inquiry is no mere formality. As the Supreme Court noted in *Rowley,* Congress's emphasis in IDEA "upon full participation of concerned parties throughout the development of the IEP," together with the requirement for federal approval of state and local plans, reflects a "conviction that adequate compliance with the procedures prescribed would in most cases assure much if not all of what Congress wished in the way of substantive content in an IEP." *Board of Educ. v. Rowley,* 458 U.S. at 206, 102 S.Ct. at 3050. In this case, the

Walczaks do not challenge the School District's compliance with IDEA's procedural requirements. The record confirms that the Walczaks, the various experts on whom they relied, and their attorney were all actively involved in the development of the challenged IEP. Indeed, numerous amendments were made at their suggestion. What the Walczaks assert is that, despite compliance with required procedures, the School District failed to produce a 1995–96 IEP that was reasonably calculated to afford B.W. educational benefits as required by the second prong of the *Rowley* test.

■■■ IDEA does not itself articulate any specific level of educational benefits that must be provided through an IEP. The Supreme Court, however, has specifically rejected the contention that the " 'appropriate' education" mandated by IDEA requires states to "maximize the potential of handicapped children." 458 U.S. at 197 n. 21, 189, 102 S.Ct. at 3046 n. 21, 3042. The purpose of the Act was "more to open the door of public education to handicapped children on appropriate terms than to guarantee any particular level of education once inside." *Id.* at 192, 102 S.Ct. at 3043; *accord Lunceford v. District of Columbia Bd. of Educ.,* 745 F.2d 1577, 1583 (D.C.Cir.1984) (Ruth Bader Ginsburg, J.) (because public "resources are not infinite," federal law "does not secure the best education money can buy; it calls upon government, more modestly, to provide an appropriate education for each `[disabled] child"). Plainly, however, the door of public education must be opened for a disabled child in a "meaningful" way. *Board of Educ. v. Rowley,* 458 U.S. at 192, 102 S.Ct. at 3043–44. This is not done if an IEP affords the opportunity for only "trivial advancement." *Mrs. B. v. Milford Bd. of Educ.,* 103 F.3d at 1121 (quoting *Polk v. Central Susquehanna Intermediate Unit 16,* 853 F.2d 171, 183 (3d Cir.1988)). An appropriate public education under IDEA is one that is "likely to produce progress, not regression." *Cypress–Fairbanks Indep. Sch. Dist. v. Michael F.,* 118 F.3d 245, 248 (5th Cir.1997) (internal citation omitted), *cert. denied,* —— U.S. ——, 118 S.Ct. 690, 139 L.Ed.2d 636 (1998).

11. *Review of the Challenged 1995–96 IEP*

■ For a federal court to conduct an "independent" review of a challenged IEP without "impermissibly meddling in state educational methodology," *Mrs. B. v. Milford Bd. of Educ.,* 103 F.3d at 1121 (citing *Board of Educ. v. Rowley,* 458 U.S. at 203, 207, 102 S.Ct. at 3049, 3051), it must examine the record for any "objective evidence" indicating whether the child is likely to make progress or regress under the proposed plan, *id.* A review of objective evidence is easiest, of course, when a disabled child is in a mainstream class. In such circumstances, the attainment of passing grades and regular advancement from grade to grade are generally accepted indicators of satisfactory progress. *See Board of Educ. v. Rowley,* 458 U.S. at 207 n. 28, 102 S.Ct. at 3051 n. 28 (deaf student's ability to perform better than average child in class and her easy advancement from grade to grade indicated that she was receiving an appropriate education despite School District's failure to provide her with a sign language interpreter). Nevertheless, this court has looked to test scores and similar objective criteria even in cases where a disabled child has been educated in self-contained special education classes. *See Mrs. B. v. Milford Bd. of Educ.,* 103 F.3d at 1121. In such circumstances, the record must, of course, "be viewed in light of the limitations imposed by the child's disability." *Id.*

■ In its brief decision in this case, the district court did not point to any objective evidence that led it to reject the administrative officers' conclusions that the 1995–96 IEP was adequate to provide B.W. with an appropriate public education. *See Kerkam v. McKenzie,* 862 F.2d 884, 887 (D.C.Cir.1989) ("a court upsetting the [administrative] officer's decision [about an IEP] must at least explain its basis for doing so"); *Town of Burlington v. Department of Educ.,* 736 F.2d 773, 792 (1st Cir.1984) (in making its own independent ruling, a court must carefully consider the findings made during administrative review "and endeavor to respond to the hearing officer's resolution of each material issue"), *aff'd,* 471 U.S. 359, 105 S.Ct. 1996, 85 L.Ed.2d 385 (1985); *accord Gregory K. v. Longview School Dist.,* 811 F.2d 1307,

1311 (9th Cir.1987) (adopting First Circuit standard). Instead, as the excerpt quoted *supra* indicates, the district court cited only to the parents' brief to support its finding that B.W. had regressed socially in 1994–95. It concluded that "inherent limitations" in the BOCES program made it impossible for B.W. to make satisfactory progress in that placement. These limitations apparently included (1) the fact that B.W. would be educated in a class of twelve students at BOCES, rather than in a smaller group; (2) the purported failure of BOCES teachers to work closely together; (3) the fact that BOCES was not a residential facility providing around-the-clock structure and social engagement; and (4) the BOCES' program's inability to provide B.W. with the sort of "specialized program and . . . supportive nurturing educational environment" she needed in order to learn most effectively. While it is undisputed that BOCES is not a residential program, the other conclusions of the district court are not supported by the objective evidence.

The evidence demonstrates that before B.W. entered BOCES her reading and mathematics skills tested at only the first-grade level. When the Walczaks' own expert, Dr. Liss, evaluated B.W. in early 1995, mid-way through her second year at BOCES, her reading scores had reached the second-grade to mid-third-grade level, and her mathematics skills were at the second-grade level. B.W.'s classroom teacher, Ms. Napolitano, reported that in the more structured and supportive atmosphere of the BOCES classroom, B.W. was actually able to work at an even higher level, particularly in mathematics where she regularly completed exercises from a third grade book. For this reason, Ms. Napolitano was convinced that B.W. could continue to progress in a twelve-student class.

These objective academic achievements are uncontradicted and certainly not "trivial." In fact, they are impressive when considered in light of the significant social problems that impeded B.W.'s academic progress when she first entered BOCES. Ms. Priestner–Werte described B.W.'s social behavior in 1992 as bizarre, "almost psychotic." Dr. Liss confirmed that, at that time, the child was unable to follow simple directions or focus on an assigned task. She perseverated constantly on irrelevancies and could not express herself intelligibly. The testimony of Ms. Napolitano and Ms. Makower, as well as the quarterly reports from BOCES, plainly indicate that concerted efforts were made by all of B.W.'s BOCES teachers to address these specific social problems. Progress was sometimes slow, but after B.W. had spent two years at BOCES, Ms. Napolitano was able to report that the child was less disruptive, that she could remain more focused, and that she was even able to work independently. Further, B.W. could now speak more clearly, an obvious prerequisite to improving her social interaction. Dr. Liss and Ms. Priestner–Werte each confirmed that the social progress made by B.W. during the years she was enrolled at BOCES was remarkable.[4]

This case is thus completely distinguishable from *Mrs. B. v. Milford Bd. of Educ.*, 103 F.3d 1114. There, all the evidence indicated that the disabled child's social problems were steadily worsening, with adverse consequences on her education. One teacher even conceded that the child was not learning anything in the day program in which she was placed. *See id.* at 1117. Under these circumstances, an administrative hearing officer concluded that a temporary residential placement was essential if the child was ever to make any academic progress. The district court concurred and we affirmed. Cases from other circuits point to similar objective evidence of a child's regression in a day program before finding a residential placement to be required by IDEA. *See, e.g., Seattle School Dist. No. 1 v. B.S.*, 82 F.3d 1493, 1497 (9th Cir.1996) (where child's assaultive behavior problems had escalated so as to require restraints, a period of hospitalization, and ultimately expulsion from school day program, such that no educational

---

4. Although Dr. Liss testified that B.W.'s social improvement was primarily due to her four-week stay at a residential camp in the summer of 1994, this opinion must be weighed in light of the fact that, after 1992, Dr. Liss did not evaluate B.W. again until January 1995, almost six months after the camp experience, and well into the child's second term at BOCES.

services were provided for six months, administrative officer and district court properly ordered residential placement); *M.C. v. Central Regional Sch. Dist.*, 81 F.3d 389, 392 (3d Cir.) (where objective evidence indicated that sixteen-year old had regressed in day program from a point where he had been able to dress and feed himself independently to a point where he could no longer do so, residential placement was plainly required), *cert. denied,* —— U.S. ——, 117 S.Ct. 176, 136 L.Ed.2d 116 (1996); *Abrahamson v. Hershman*, 701 F.2d 223, 224–25 (1st Cir. 1983) (child who "would not respond to his name, did not seem to understand anything at all, and had to be locked into the classroom to prevent him from running off" could not be educated in a day program but required a residential placement).

■ While some children's disabilities may indeed be so acute as to require that they be educated in residential facilities, it is appropriate to proceed cautiously whenever considering such highly restrictive placements. IDEA's preference is for disabled children to be educated in the least restrictive environment capable of meeting their needs. The Walczaks argue that the statutory preference is primarily concerned with educating disabled children together with their non-disabled peers. They submit that in cases such as this one, where everyone recognizes that no mainstreaming is possible for B.W., the preference has no applicability. This court disagrees. The norm in American public education is for children to be educated in day programs while they reside at home and receive the support of their families. A "[r]esidential placement is, by its nature, considerably more restrictive than local extended day programming." *Carlisle Area School v. Scott P.*, 62 F.3d 520, 534 (3d Cir.1995), *cert. denied,* 517 U.S. 1135, 116 S.Ct. 1419, 134 L.Ed.2d 544 (1996). Thus, "[e]ven in cases in which mainstreaming is not a feasible alternative," the statutory preference for a least restrictive placement applies. *Sherri A.D. v. Kirby*, 975 F.2d 193, 206 (5th Cir. 1992). The objective evidence in this case demonstrates that B.W. could make meaningful academic and social progress in a day program. While her BOCES teachers have candidly acknowledged the difficulties encountered in teaching B.W., the overall picture is plainly one of improvement, not regression.

■ It appears from the Walczaks January 27, 1995 letter to CSE Chairman Flynn that their purpose in seeking a residential placement for B.W. was "to obtain the maximum interventions" for her "so that she can reach her true potential." While the parents' wishes are understandable, IDEA does not require states to develop IEPs that "maximize the potential of handicapped children." *Board of Educ. v. Rowley*, 458 U.S. at 189, 102 S.Ct. at 3042. What the statute guarantees is an "appropriate" education, "not one that provides everything that might be thought desirable by loving parents." *Tucker v. Bay Shore Union Free Sch. Dist.*, 873 F.2d at 567 (internal citation omitted); *see Carlisle Area School v. Scott P.*, 62 F.3d at 533–34 (school districts "need not provide the optimal level of services, or even a level that would confer additional benefits, since the IEP required by IDEA represents only a 'basic floor of opportunity'" (quoting *Board of Education v. Rowley*, 458 U.S. at 201, 102 S.Ct. at 3048)); *Kerkam v. McKenzie*, 862 F.2d at 886 ("proof that loving parents can craft a better program than a state offers does not, alone, entitle them to prevail under the Act"). A disabled child is "not . . . entitled to placement in a residential school merely because the latter would more nearly enable the child to reach his or her full potential." *Abrahamson v. Hershman*, 701 F.2d at 227. Indeed, it would violate IDEA's preference for the least restrictive educational setting to move a child from a day program where she is making progress to a residential facility simply because the latter is thought to offer superior opportunities. *See Carlisle Area School v. Scott P.*, 62 F.3d at 535 (although disabled child might have benefitted more from residential placement, "the district would have erred if it had ordered the allegedly 'better' residential placement since . . . an IEP must not only be designed to confer some educational benefit, but it also must deliver the programming in the least restrictive educational environment").

The Walczaks insist that a residential placement was not simply more desirable but essential for B.W., particularly if she was to overcome her resistance to interacting with other children. They contrast the difficulties she was having in this area at BOCES with her present participation in a variety of group activities at Maplebrook. The inadequacy of an IEP is not established, however, simply because parents show that a child makes greater progress in a single area in a different program. *See Fuhrmann v. East Hanover Bd. of Educ.,* 993 F.2d 1031, 1039–40 (3d Cir.1993) (child's "dramatic progress" in alternative program chosen by parents does not, by itself, establish that proposed IEP was not "reasonably calculated to enable the child to receive educational benefits" (quoting *Board of Educ. v. Rowley,* 458 U.S. at 206–07, 102 S.Ct. at 3051)). In fact, B.W.'s resistance to social interaction while at BOCES must be viewed in context. Without minimizing the seriousness of this particular problem, it appears that, among the numerous social deficiencies that plagued the child when she entered BOCES, this was the one that least directly interfered with her ability to make academic progress. Certainly, it was of less immediate concern to her receipt of educational benefits than her lack of focus or her disruptive behavior. Over two years, BOCES teachers had helped B.W. improve in both these areas, and significant academic and social gains were thereafter realized. Under these circumstances, the BOCES program cannot be conclusorily dismissed as "inherently deficient," nor its teacher coordination broadly faulted, nor its structure criticized because it failed simultaneously to overcome B.W.'s resistance to peer interaction. IDEA requires states to provide a disabled child with meaningful access to an education, but it cannot guarantee totally successful results. *See Board of Educ. v. Rowley,* 458 U.S. at 192, 102 S.Ct. at 3043–44 (citing S.Rep. No. 94–168, at 11 (1975), *reprinted in* 1975 U.S.Code Cong. & Admin. News 1425, 1435).

In any event, the challenged IEP specifically addressed B.W.'s need to interact with other children, and Dr. Liss acknowledged that the goals established therein were appropriate. Her concern was with BOCES' ability to help the child reach these goals. As the hearing officer properly observed, however, Dr. Liss never satisfactorily explained why B.W. could only improve her interaction skills in a residential program. The BOCES developmentally disabled program was, after all, designed to emphasize students' practical social skills. Further, the IEP provided for B.W. to continue receiving group counseling and speech therapy to assist her with these skills. In assessing whether this plan was likely to produce progress, Ms. Priestner–Werte's testimony is particularly relevant. Although she viewed Maplebrook as a superior facility, she stated that the BOCES program for the developmentally disabled was sufficiently structured and supportive to meet B.W.'s academic and social needs. It was entirely appropriate for the hearing officer to rely on this testimony and to reject that of Dr. Liss, particularly since Ms. Priestner–Werte had had considerably more contact with both B.W. and BOCES personnel during the years the child was enrolled there.

Alternatively, the Walczaks contend that the challenged IEP is deficient because it proposed to group B.W. in a class with children whose intellectual, social, and behavioral needs were incompatible with her own. The district court, however, did not find the proposed IEP inadequate on this ground. Neither does this court. The students' IQ, reading, and mathematics scores indicate that a core group was operating at an intellectual level sufficiently comparable to B.W.'s to permit her to continue making academic progress. BOCES personnel testified that the differences in the children's raw behavioral scores did not indicate any violent or disruptive tendencies that would have made B.W.'s inclusion in the group inappropriate. To the contrary, it was hoped that the open nature of the other children and their superior social skills would make it easier for B.W. to interact with them. Although B.W. was the only child in the proposed group diagnosed with pervasive disability disorder, this condition appears to be evidenced by a wide variety of problems many of which are also characteristic of other disorders. The record indicates that, whatever their specific disabil-

ities, the students in the proposed grouping were all slow learners. Each needed a highly structured, multisensory program with constant reinforcement in order to grasp the material presented. This was precisely the approach followed in the BOCES developmentally disabled program.

This court finds that the objective evidence in this case cannot support the district court's conclusion that a BOCES placement was inadequate to provide B.W. with an appropriate education or that a residential placement was essential to meet her needs. Instead, a clear preponderance of that evidence demonstrates that B.W. could make satisfactory academic and social progress in a twelve-student class in the BOCES day program for the developmentally disabled. The Walczaks are, of course, free to continue educating their daughter at Maplebrook if they wish. Nevertheless, because the School District has demonstrated by a clear preponderance of the evidence that the 1995–96 IEP complied with the requirements of IDEA, it cannot be ordered to reimburse the parents for expenses incurred as a result of their decision to remove their child from the BOCES program.

### Conclusion

A preponderance of the evidence in this case clearly supports the conclusion reached by the two administrative officers: that the challenged 1995–96 IEP was adequate to provide B.W. with an appropriate public education as required by IDEA. The judgment of the district court in favor of the Walczaks is reversed and the case is remanded with directions to enter summary judgment in favor of the School District.