340 F.3d 87
 Eleanor SHERMAN and Armen Nishanian, as parents of son Grant Nishanian, Plaintiffs-Appellees,
v.
MAMARONECK UNION FREE SCHOOL DISTRICT, Sherry King, Individually and in her capacity as Superintendent of the Mamaroneck Union Free School District, Michael Luzzi, Individually and in his capacity as Section 504 Coordinator, Mark Orfinger, Individually and in his capacity as High School Principal, Anne Garcia, Individually and in her capacity as Unit Principal of Mamaroneck High School, Jane Friedlander, Dr., and Mamaroneck Union Free School Board, Defendants, and
Mamaroneck Union Free School District, Defendant-Appellant.
 Docket No. 02-7335.
 United States Court of Appeals, Second Circuit.
 Argued: October 23, 2002.
 Decided: August 12, 2003.
 
 MARK C. RUSHFIELD, Shaw & Perelson, LLP, Highland, New York, for Defendant-Appellant.
 JOHN W. FREEMAN, Jamaica, New York, for Plaintiffs-Appellees.
 Before: WINTER, McLAUGHLIN, and CABRANES, Circuit Judges.
 WINTER, Circuit Judge.
 
 
 1
 The Mamaroneck Union Free School District ("School District") appeals from Judge Brieant's decision that it violated the Individuals with Disabilities Education Act ("IDEA"), 20 U.S.C. § 1400 et seq. The issue on appeal is whether the district court erred when it concluded that appellant had denied Grant Nishanian ("Grant") a free appropriate public education by denying him use of an advanced calculator in a particular mathematics class. Because the district court failed to give proper deference to the administrative rulings of the Impartial Hearing Officer ("IHO") and State Review Officer ("SRO"), we vacate and order entry of judgment for appellant.
 
 BACKGROUND
 
 2
 a) Origins of the Dispute
 
 
 3
 Prior to entering high school, Grant was classified by the School District's Committee on Special Education ("CSE") as "learning disabled" because of a disorder affecting his ability in mathematics. As required by federal regulations, 34 C.F.R. §§ 300.300, 300.343-300.347, the CSE met at least annually to fashion an Individualized Education Program ("IEP") designed to provide Grant with a free appropriate public education consistent with the IDEA, 20 U.S.C. § 1412(a)(1).
 
 
 4
 Grant successfully completed freshman and sophomore mathematics courses using several assistive technology devices, including a Texas Instruments Model 82 calculator ("TI-82"). The TI-82 is a scientific/graphing calculator that can be cable linked to a computer. On March 6, 1998, in the spring of Grant's sophomore year, the School District's CSE prepared an IEP for his junior year that again allowed Grant to have use of a scientific/graphing calculator and a cable link to a computer. The IEP did not name a specific model of calculator, however.
 
 
 5
 Sometime thereafter, but apparently before receiving the IEP, Grant's mother, appellee Eleanor Sherman ("Sherman"), requested that the School District allow Grant to use a more advanced calculator, the Texas Instruments Model 92 ("TI-92"), in his upcoming Math 3A class. Notes from a meeting held in May, 1998, indicate that it was agreed that Grant's teachers would determine whether use of the TI-92 during tests would be appropriate.
 
 
 6
 On or about June 16, 1998, Sherman received the IEP for Grant's junior year. Although Sherman signed a form indicating that she consented to implementation of the IEP, she also noted that she did so "under protest regarding study in Biology, and Geometry Sketch pad instruction only." Sherman did not raise the issue of Grant's use of a TI-92 calculator in her consent to the implementation of the IEP, but she subsequently contacted the New York State Department of Education about whether the TI-92 would be an acceptable testing modification for her son. She was told that a TI-92 with a qwerty keyboard was an acceptable testing modification on a state examination and that one state school used the TI-92 with all its disabled students.
 
 
 7
 When the school year started, it remained unclear whether the School District would allow Grant to use the TI-92. Appellees viewed the lack of a definitive decision as permission to use it, and Grant began using the TI-92 about three weeks into the fall semester. When Ms. Elaine Peikes, Grant's Math 3A teacher, discovered that Grant was using the TI-92 on a test, she contacted the high school building and house principals and the mathematics department chairperson. Ms. Peikes and these other school officials proposed a compromise in which Grant would retake the test using the TI-82 to show his work but could use the TI-92 to check his answers. Appellees rejected the compromise and Grant received an "Incomplete" in Math 3A for the first marking period.
 
 
 8
 At around this time, Sherman informed the School District that Grant needed the TI-92 to factor. In the Math 3A curriculum, factoring requires the student to demonstrate the steps followed to arrive at the correct mathematical answer. Factoring constitutes a significant component of the Math 3A curriculum. It is undisputed that the TI-92 provides the final answer but not the steps leading to it whereas the TI-82 requires the student to engage in the various steps of analysis to get to the right answer. In a letter dated October 27, 1998, Unit Principal Anne Garcia-Murruz informed Sherman that Grant's teachers were of the opinion that Grant could learn to factor and that use of the TI-92 was not appropriate because it would circumvent this part of the learning process. The letter stated in part:
 
 
 9
 All three teachers agree that Grant can learn to factor. Ms. Peikes assures me that he is learning to factor. On his most recent quiz, Grant factored eleven out of twelve expressions correctly.... [By contrast] the TI-92 does the factoring, rather than allow Grant to demonstrate that he knows how to factor. It is educationally beneficial for Grant to acquire new skills, well within his capability. It would, therefore, be inappropriate for him to retake tests using the TI-92 to factor.
 
 
 10
 b) School District Proceedings
 
 
 11
 On December 18, 1998, following communications with members of the Board of Education and an unsuccessful appeal to the School District's superintendent, Grant and his parents met with the building principal, the School District's Assistant Superintendent for Administration and Personnel, the Assistant Supervisor of Special Education, and Grant's resource room teacher. They discussed, inter alia, the procedures to be followed when Grant took tests and quizzes, his use of a calculator and laptop computer, and the method of grading to be applied in his math class.
 
 
 12
 In a letter dated December 18, 1998, Principal Mark P. Orfinger summarized the results of the meeting, namely, that Grant would not be allowed to use the TI-92 either in class or during exams. The letter also stated that Grant's first marking period grades would not count towards his final grade in Math 3A and that he would be given an alternative assessment — limited to use of the TI-82 — in order to allow him to demonstrate mastery of the topics taught prior to December 18, 1998. Ms. Peikes testified that she provided Grant with this alternative assessment over the Christmas holiday period but that he never turned in the work.
 
 
 13
 c) Administrative Proceedings
 
 
 14
 Following receipt of Principal Orfinger's letter, Sherman sent letters to the building principal and the superintendent of schools expressing dissatisfaction with the outcome and alleging that her son was being discriminated against on the basis of his disability. Sherman had already requested an impartial hearing on December 16, 1998, for the purpose of amending Grant's IEP. Sherman reiterated this request in a December 23, 1998 letter, alleging, in relevant part, violations of the IDEA and Section 504 of the Rehabilitation Act of 1973, 29 U.S.C. § 794 (prohibiting discrimination against otherwise qualified disabled individuals in any program receiving federal financial assistance).
 
 
 15
 Hearings pursuant to IDEA, 20 U.S.C. § 1415(f), before IHO George Kandilakis commenced on January 25, 1999, and continued on February 3 and 8, March 3 and 18, and April 13 and 19, 1999. The relevant testimony focused on the educational goals of the Math 3A curriculum, whether the TI-92 was consistent with these goals, whether Grant could answer factoring questions without the TI-92, and whether use of the TI-82 was sufficient to allow Grant to succeed in Math 3A.
 
 
 16
 The teachers and administrators were in agreement that success in Math 3A involved more than simply arriving at the right answer. For example, Ms. Peikes testified that students also had "to show the mathematical steps to solve a problem." Several of the School District witnesses also testified that the TI-92 was not an appropriate assistive learning device in this regard because it would allow Grant to answer questions without demonstrating any understanding of the underlying mathematical concepts. For example, Ms. Geraldine Brause, Grant's ninth-grade algebra teacher, testified, "I worry about the TI-92 stopping that [process of understanding] and it would be just hitting a button, you get an answer and there's no convincing argument that shows me that the student understands the process and has learned something." Ms. Garcia-Marruz stated that "[t]he calculator model [TI-92] denies us the ability to see if G[rant] knows what he's doing and has taken the steps necessary to solve the problem."
 
 
 17
 There was also universal agreement among the School District teachers and administrators that the TI-82 struck the right balance between educational assistance and the need for Grant to show mastery of the underlying mathematical concepts. Grant's math teachers demonstrated at the hearing how the TI-82 — in a step-by-step approach — could be used in a manner consistent with the educational goals of the Math 3A curriculum to assist a student in answering questions that required factoring and multi-step operations. Moreover, three of the School District's witnesses testified that Grant was capable of factoring based upon their prior observations of his math assignments and exams.
 
 
 18
 Grant himself testified that the TI-82 was sufficient for him to answer questions in Math 3A: "Using the TI 82 I could prove my work to Ms. Peikes by writing the steps she would like me to show. On some examples it takes me a very, very, long time to find the answer." Additionally, Ms. Brause testified that if an assistive technology device proved incapable of directing a student to the right answer, then some form of alternative assessment would be devised to measure and assess the student's performance.
 
 
 19
 There was also testimony that Grant's resistance to solving problems without the TI-92 was a major factor in his poor performance. As the IHO stated:
 
 
 20
 Then why is [Grant] failing Course 3A? His teachers believe that he is purposely failing. More importantly, [Grant] is not performing the tasks required so that the teachers can properly evaluate his understanding of the work. For example, he wrote on an assessment: "do not remember how to do without the TI 92." When asked to take a quiz without the TI 92, he wrote, "this is in violation of my rights." He stated again on the math midterm: "cannot be done with the TI 82." The grade of 15 that he received was because he didn't attempt the problems or show his work, according to his resource room teacher.
 
 
 21
 In addition to the testimony at the impartial hearing, a Student Technology Consultation was performed in March 1999 by David L. Grapka, a Certified Assistive Technology Practitioner. This consultation confirmed many of the views offered by the School District's witnesses. During one part of the consultation, Grapka had Grant review his wrong answers on an earlier math midterm. In three instances, without the assistance of a calculator, Grant solved problems he had gotten wrong or partially wrong on the midterm. He solved another question by using the TI-92, but conceded that his entry of the data "only shows that I know[] how to press buttons. I know more than that." On two other questions, Grant attempted the problem with the TI-82, but it yielded an answer in decimal form whereas the question required that it be expressed in radical terms. Grant explained the steps he would use to solve the problem, used the TI-82 to assist with multiplication, and then got the right answer using the TI-92. Based upon his observations of Grant's problem-solving abilities with the TI-82 and TI-92, Grapka concluded that
 
 
 22
 Because Grant has demonstrated that he understands and can explain the steps needed to solve problems on the math course 3A mid term, and because the TI-92 does not require a student to demonstrate his or her problem-solving steps, it is not necessary for Grant to use the TI-92 to actually solve the problems for him and then copy the answers from the TI-92 to the test answer sheet.
 
 
 23
 Grapka recommended that Grant continue using the TI-82 as a tool to solve problems, and that his use of the TI-92 be limited to checking answers because "[h]e is capable of demonstrating mastery without it."
 
 
 24
 In his decision, the IHO concluded that: (i) the IEP for Grant's junior year was reasonable;[1] (ii) the School District had implemented the IEP's test modification and accommodations requirements; and (iii) the School District had met its requirements under the IDEA and Section 504 of the Rehabilitation Act with regard to Grant's effective participation in Math 3A by providing him with appropriate assistive technology, extra assistance from professionals, note takers, and study notes.
 
 
 25
 Sherman appealed the IHO's decision to the SRO, as provided in the IDEA, 20 U.S.C. § 1415(g).[2] The SRO concluded that the School District had: (i) not denied Grant a free appropriate public education in his Math 3A course when it required him to use the TI-82 rather than the TI-92; (ii) properly implemented the IEP; and (iii) provided proper instruction in Math 3A.
 
 
 26
 d) District Court Decision
 
 
 27
 Sherman then instituted the present action, asserting four claims against the School District and other defendants under both the IDEA and Section 504 of the Rehabilitation Act of 1973. The district court granted summary judgment for appellants on the Section 504 claim and dismissed all IDEA claims against individual defendants on qualified immunity grounds. It observed that "[t]he evidence indicates that their collective decision to deprive Grant use of the T.I.92 was the result of a good faith attempt to exercise their discretion as professional educators." Sherman v. Mamaroneck Union Free Sch. Dist., No. 00 Civ. 6285, slip op. at 16-17 (S.D.N.Y. Jan. 31, 2002) (memorandum and order). The district court also granted summary judgment to all defendants on the claim that the School District had failed to comply with the procedural requirements of IDEA by failing to convene a meeting of the CSE to revise Grant's IEP before changing his testing modifications.
 
 
 28
 However, the district court granted appellees summary judgment on their claim that the School District had violated Section 1412(a)(12)(B)(i) of the IDEA by not providing Grant with the assistive technology — the TI-92 — necessary to ensure a free appropriate public education. The court concluded that the TI-92 was necessary for Grant's educational success because "[w]ithout the T.I.92, Grant did not and could not pass." Id. at 22.[3] The court noted that Grapka's report to the IHO indicated that Grant had relied exclusively on the TI-92 to solve several questions on the exam, and that he could explain the process of how he arrived at answers garnered from use of the TI-92. These facts, the district court found, "lead to the inevitable conclusion that Grant needed the T.I.92 to perform in Math 3A and that he could demonstrate comprehension of the material while using the T.I.92." Id. at 19.
 
 
 29
 The district court also concluded that the evidence did not support the findings of the IHO and the SRO that Grant's lack of effort had contributed to his failing grade in Math 3A. The court found that Grant's nearly perfect attendance record contradicted his teachers' assertions that he was choosing not to learn, and that Grant's comments on his exam stating that he could not solve the problem without the TI-92 and that his rights were being violated did not clearly demonstrate a lack of motivation to learn.
 
 
 30
 The district court awarded Sherman $28,391.25, which included attorneys' fees and damages. This appeal followed. The only issue before us is the IDEA claim with regard to use of the TI-92.
 
 DISCUSSION
 
 31
 We review the district court's grant of summary judgment de novo. See M.S. v. Bd. of Educ. of Yonkers, 231 F.3d 96, 102 (2d Cir.2000).
 
 
 32
 To receive federal funding under the IDEA, a state must, inter alia, provide to all children with disabilities "[a] free appropriate public education." 20 U.S.C. § 1412(a)(1); see also 20 U.S.C. § 1400(c)(3), Walczak v. Fla. Union Free Sch. Dist., 142 F.3d 119, 122 (2d Cir.1998). One of the requirements under the IDEA is that an IEP be "reasonably calculated" to confer "educational benefits." Bd. of Educ. of the Hendrick Hudson Sch. Dist., Westchester County v. Rowley, 458 U.S. 176, 206-07, 102 S.Ct. 3034, 73 L.Ed.2d 690 (1982); Walczak, 142 F.3d at 129. The School District bears the burden of proving that it has met this requirement. See M.S., 231 F.3d at 102. The core issue before us, therefore, is whether the School District's denial of the use of a TI-92 in Grant's Math 3A course, confirmed by the decisions of the IHO and SRO, deprived him of a free appropriate public education.
 
 
 33
 In IDEA actions such as the present one, the administrative record and ruling play a critical role. A district court's decision must rest on the "preponderance of the evidence developed at the administrative proceedings and any further evidence presented by the parties." Id. (quoting Walczak, 142 F.3d at 122-23). Moreover, as the Supreme Court has noted, this assessment "is by no means an invitation to the courts to substitute their own notions of sound educational policy for those of the school authorities which they review." Rowley, 458 U.S. at 206, 102 S.Ct. 3034. "While federal courts do not simply rubber stamp administrative decisions, they are expected to give `due weight' to these proceedings, mindful that the judiciary generally `lack[s] the specialized knowledge and experience necessary to resolve persistent and difficult questions of educational policy.'" Walczak, 142 F.3d at 129 (quoting Rowley, 458 U.S. at 206, 208, 102 S.Ct. 3034) (internal quotation marks and citation omitted); see also M.C. ex rel. Mrs. C. v. Voluntown Bd. of Educ., 226 F.3d 60, 66 (2d Cir.2000) ("Judicial deference is particularly appropriate when... the state hearing officer's review has been thorough and careful.") (internal quotation marks and citation omitted) (alteration in original).
 
 
 34
 In the present matter, the district court granted summary judgment for appellees based on the administrative record. Were we reviewing a decision reached after a plenary trial involving credibility determinations, instead of a district court review of an administrative decision entitled to deference, we would likely affirm. But under a standard of deferential review, the administrative decision here, which is amply supported by the evidence in the record, must prevail as a matter of law.
 
 
 35
 To be sure, it is undisputed that Grant ultimately failed his Math 3A course and that access to the TI-92 would have — under most circumstances — provided correct answers on his Math 3A exams. Passing grades are, of course, often indicative of educational benefit. See Rowley, 458 U.S. at 207 n. 28, 102 S.Ct. 3034 ("When the handicapped child is being educated in the regular classrooms of a public school system, the achievement of passing marks and advancement from grade to grade will be one important factor in determining educational benefit."); Walczak, 142 F.3d at 130 ("[T]he attainment of passing grades and regular advancement from grade to grade are generally accepted indicators of satisfactory progress."). Grant's failing grades are therefore evidence of a denial of educational benefit.
 
 
 36
 Nevertheless, failing grades are not dispositive. The IDEA does not require school districts to pass a student claiming a disability when the student is able, with less than the assistive aids requested, to succeed but nonetheless fails. If a school district simply provided the assistive devices requested, even if unneeded, and awarded passing grades, it would in fact deny the appropriate educational benefits the IDEA requires.
 
 
 37
 In this case, therefore, the failing grades must be viewed in light of the evidence as a whole. The IHO and SRO found that Grant was able to pass Math 3A without using the TI-92 and that learning to factor would provide him with educational benefits; they further found that his failing grades in Math 3A were due to his failure to make a sufficient effort. These conclusions find ample support in the record.
 
 
 38
 Several of Grant's teachers testified that he was capable of factoring with the assistance of the TI-82. The only testimony to the contrary was from Grant himself, but even this testimony was undermined by his admission that the TI-82 was sufficient for him to answer questions in Math 3A. Moreover, Grant's Math 3A teacher demonstrated how the TI-82 could be used to factor, albeit in a step-by-step process. There was also evidence that Grant was responsible for his failing grades in Math 3A. The School District provided Grant with an alternative assessment in December 1998, but he never completed the work. In other exams, he refused even to attempt to answer questions, although his own testimony and his work with Grapka showed at least some ability to factor with regard to those questions.
 
 
 39
 In rejecting the conclusions of the IHO and SRO, the district court relied upon the Grapka Report as suggesting that Grant needed access to the TI-92 to succeed in Math 3A. However, this is a misreading of the report. The report recommended only that Grant be allowed to use the TI-92 to check his math problem-solving "as needed." Grapka also concluded that the TI-82 was the appropriate assistive technology device for solving problems because Grant was capable of demonstrating mastery of the Math 3A materials without the aid of the TI-92. As noted, the School District indicated a willingness to provide an "alternative assessment" where the limitations of the TI-82 actually prevented Grant from competing equally with his peers. However, the dispute at all times concerned appellees' demand that the TI-92 be used to solve Math 3A problems. In fact, they rejected a compromise proposal that the TI-92 be used only to check answers.
 
 
 40
 Therefore, the administrative proceedings were thorough and arrived at a conclusion that is amply supported by the record. Given the deferential standard of review, summary judgment should have been granted to appellant.
 
 
 41
 For the reasons stated, we vacate and order entry of judgment for appellant.
 
 
 
 Notes:
 
 
 [1]
 The IHO made several recommendations for improving the CSE's evaluation of Grant. For example, the IHO recommended that when the CSE conducts triennial evaluations that it pay "special attention ... to [Grant's] mathematics ability without the use of a calculator" and that the CSE conduct its own educational assessment with and without the calculator
 
 
 [2]
 New York State Education Law makes no provision for state-level administrative review of local hearing officer decisions in hearings held pursuant to Section 504 of the Rehabilitation Act. The appeal to the SRO did not, therefore, involve claims under that Act
 
 
 [3]
 The district court also faulted the School District for designing an IEP that was "vague and ambiguous" and then failing to provide guidance as to which "scientific graphing calculator" would be appropriate for Grant's Math 3A classId. at 18, 20. The court further determined that the School District's "untimely and ever changing responses" to whether Grant could use the TI-92 had contributed to his educational regression. Id. at 20. Because we conclude that the denial of the use of a TI-92 did not violate the IDEA, these observations do not affect our disposition of the case.