M.N. and H.N., on behalf of J.N., Plaintiffs,

v.

**NEW YORK CITY DEPARTMENT OF EDUCATION, REGION 9 (DISTRICT 2), Defendant.**

**No. 09 Civ. 20(RJS).**

United States District Court, S.D. New York.

March 25, 2010.

Gary S. Mayerson, Mayerson and Associates, New York, NY, for Plaintiffs.

Janice Casey Silverberg, Janice Louise Birnbaum, New York City Law Depart., Office of The Corporation Counsel, Bronx, NY, for Defendant.

MEMORANDUM AND ORDER

RICHARD J. SULLIVAN, District Judge:

Plaintiffs M.N. and H.N., on behalf of their minor child, J.N., bring this action pursuant to the Individuals with Disabilities Education Improvement Act ("ID-

EIA")[1] against Defendant New York City Department of Education ("DOE"). Plaintiffs have moved for modified *de novo* review of the August 14, 2008 administrative decision of Impartial Hearing Officer Ellen Fluhr Thomas and the November 26, 2008 decision of State Review Officer Paul F. Kelly regarding the adequacy of J.N.'s individualized education program for the 2007–2008 school year. The DOE has cross-moved for summary judgment. For the reasons that follow, Plaintiffs' motion is denied, and Defendant's motion for summary judgment is granted.

## I. BACKGROUND

### A. Statutory Framework

■ The IDEIA requires states receiving federal funds to provide children with disabilities a "free appropriate public education." 20 U.S.C. § 1412(a)(1)(A). Under the IDEIA, a free appropriate public education ("FAPE") must provide "special education and related services tailored to meet the unique needs of a particular child" that are " 'reasonably calculated to enable the child to receive educational benefits.' "[2] *Walczak v. Fla. Union Free Sch. Dist.*, 142 F.3d 119, 122 (2d Cir.1998) (quoting *Bd. of Educ. v. Rowley*, 458 U.S. 176, 207, 102 S.Ct. 3034, 73 L.Ed.2d 690 (1982)).

■ The special education and related services required by the IDEIA are provided to students pursuant to an individualized education program ("IEP"), which school districts must provide annually. 20 U.S.C. § 1414(d). The IEP is a written program of instruction that "sets out the child's present educational performance, establishes annual and short-term objectives for improvements in that performance, and describes the specially designed instruction and services that will enable the child to meet those objectives." *Honig v. Doe*, 484 U.S. 305, 311, 108 S.Ct. 592, 98 L.Ed.2d 686 (1988). The IEP is developed by a "team" consisting of the child's parents, teachers, representatives of the local educational agency, and, where appropriate, the child. 20 U.S.C. § 1414(d)(1)(B). In New York, the IEP team is called the Committee on Special Education ("CSE"). *See* N.Y. Educ. Law § 4402(1)(b)(1).

The IDEIA also provides "procedural safeguards" to ensure that students with disabilities receive a FAPE. 20 U.S.C. § 1415(a). Specifically, the IDEIA requires that states provide parents with the opportunity to present complaints "with respect to any matter relating to the identification, evaluation, or educational placement of the child, or the provision of a free appropriate public education to such child." *Id.* § 1415(b)(6)(A). New York State has implemented a two-tiered system of administrative review. N.Y. Educ. Law § 4404. Under the first tier, parents dissatisfied with a proposed IEP may have it reviewed by an impartial hearing officer ("IHO"). N.Y. Educ. Law § 4404(1). Following the decision of the IHO, an aggrieved party may appeal to a state review officer ("SRO"). *Id.* § 4404(2). After exhausting this two-step administrative process, any party still aggrieved may bring a

---

1. In 2004, Congress reauthorized the Individuals with Disabilities Education Act ("IDEA") as the Individuals with Disabilities Education Improvement Act. *See* Pub.L. No. 108–446, 118 Stat. 2647 (Dec. 3, 2004), effective July 1, 2005. Throughout this Memorandum and Order, statutory references will be to the IDEIA, except where quoted in opinions as the IDEA.

2. The IDEIA defines "related services" as "transportation, and such developmental, corrective, and other supportive services … as may be required to assist a child with a disability to benefit from special education." 20 U.S.C. § 1401(26)(A).

civil action challenging the decision in federal or state court. 20 U.S.C. § 1415(i)(2)(A); N.Y. Educ. Law § 4404(3). Pursuant to the IDEIA's "stay put" provision, parents have the right to keep their child in his current educational placement during the pendency of these proceedings. 20 U.S.C. § 1415(j); *see also Mackey v. Bd. of Educ.*, 386 F.3d 158, 163 (2d Cir. 2004) (discussing IDEIA's "stay put" provision).

## B. Facts

The following facts are taken from the administrative record and the exhibits submitted by the parties.[3] J.N., a child with autism, was born in January 2002. In September 2005, J.N. began attending the Gramercy School, where he received special education services through the Committee on Preschool Special Education ("CPSE").[4] (IHO Ex. P at 1.)[5]

On September 19, 2006, the CPSE convened to formulate J.N.'s IEP for the 2006–2007 school year. (IHO Ex. D at 1.) The resultant IEP recommended that J.N. be placed in a special class with an 8:1:2 ratio of students to teachers to aides. (*Id.*) The IEP further provided for twelve hours per week of special education itinerant teacher ("SEIT") services, three hours per week of occupational therapy, and one hour per week of physical therapy.[6] (*Id.*)

By letter dated May 4, 2007, J.N.'s parents learned that, pursuant to a lottery, J.N. was being offered a seat at the New York Center for Autism Charter School (the "Charter School") and could begin attending classes at the start of the 2007–2008 school year. (IHO Ex. G.) The Charter School is a state-approved public school with 28 students, all of whom are classified

3. The IDE1A provides that a reviewing court "shall hear additional evidence at the request of a party." 20 U.S.C. § 1415(i)(2)(C)(ii). This Court has considered the additional evidence submitted by the parties, with the exception of three of Plaintiffs' exhibits. The first is a *Wall Street Journal* article entitled "Schools Beat Back Demands for Special–Ed Services." (Decl. of Gary S. Mayerson, Ex. E, dated May 22, 2009.) The article chronicles complaints about the SRO in this case and implies that the SRO is biased against parents. Three other courts have rejected Plaintiffs' counsel's attempt to introduce this article. *See Student X v. N.Y. City Dep't of Educ.*, No. 07 Civ. 2316(NGG), 2008 WL 4890440, at *4 n. 3 (E.D.N.Y. Oct. 30, 2008); *M.M. ex rel. A.M. v. N.Y. City Dep't of Educ. Region 9 (Dist.2)*, 583 F.Supp.2d 498, 503 (S.D.N.Y.2008); *A.D. v. N.Y. City Dep't of Educ.*, 06–8306, slip op. at 13 n.6 (S.D.N.Y. Apr. 21, 2008). Like those courts, this Court finds the article constitutes inadmissible hearsay. The Court also declines to consider two other untimely documents, which purport to be records from the New York Center for Autism Charter School, J.N.'s current school. (Decl. of Gary S. Mayerson, Exs. H, I, dated July 13, 2009.) Although the documents appear to contain information concerning the amount of related services each enrolled student receives, neither document has been authenticated or is relevant to the issue of whether the DOE has provided J.N. with a FAPE.

4. In New York, every school district has both a CPSE and a CSE. The CPSE develops educational programs for disabled children aged three to five, and the CSE develops such programs for disabled children aged five to twenty-one. *See* NY. Educ. Law. §§ 4402, 4410.

5. "IHO Exhibits" are exhibits that were entered into evidence at the hearing before the IHO. Citations to "Tr." refer to the transcript of that hearing.

6. SEIT services are provided to preschool children aged three to five years old and consist of individualized instruction from a special education teacher in a natural setting, such as a nursery school or the child's home. N.Y. Educ. Law § 4410($l$)(k). In this case, the SEIT used the one-on-one Applied Behavior Analysis ("ABA") methodology, a program developed for children with autism that incorporates positive reinforcement, repetition, and generalization of specific behaviors. (Tr. at 183–84, 206–08.)

with autism or pervasive developmental disorder. (Tr. at 29–30.) The Charter School employs the ABA model and provides a 4:1:3 student to teacher to aide ratio for each class. (Tr. at 30–31.) The Charter School does not, however, offer after-school related services such as speech therapy and occupational therapy. (Tr. at 73–74, 234.)

On May 8, 2007, prior to Plaintiffs formally accepting the seat at the Charter School, the CSE convened in order to develop J.N.'s IEP for the 2007–2008 school year. (IHO Ex. B.) At the meeting, J.N.'s parents informed the school district that J.N. had been accepted into the Charter School. Because of an administrative error, however, the CSE was unable to recommend the Charter School as J.N.'s placement in the IEP.[7] (Tr. at 253.) Nevertheless, the CSE formulated an IEP that recommended that J.N. be placed in a specialized class on a twelve-month basis with a 6:1:1 student to teacher to aide ratio. (IHO Ex. B at 1.) The IEP further recommended the related services of individual speech and language therapy (two-and-a-half hours per week), occupational therapy (two-and-a-half hours per week), and physical therapy (thirty minutes per week). (Id.) The IEP did not recommend the continuation of SEIT services, as those services are only provided for preschool students. N.Y. Educ. Law § 4410(1).

On May 16, 2007, J.N.'s parents formally accepted the seat at the Charter School. (IHO Ex. G.) By letter dated June 10, 2007, the parents notified the DOE that they would be placing their child in the Charter School. (IHO Ex. F.) Because the Charter School did not offer the after-school related services recommended by the May 2007 IEP, Plaintiffs, on July 27, 2007, filed a due process complaint seeking to have those services provided privately at the DOE's expense. (IHO Ex. A.)

The impartial hearing commenced on September 26, 2007. (Tr. at 1.) At the hearing, the parties stipulated that, pursuant to the IDEIA's "stay put" provision, J.N. was entitled to continue receiving, at Defendant's expense, the SEIT and related services that were set forth in the September 2006 IEP throughout the pendency of the action.[8] (Tr. at 7–8.) Without taking testimony from any witnesses, the parties agreed to adjourn the hearing and to argue the merits of the case at a future date. (Tr. at 9.)

On January 31, 2008, the CSE reconvened to revise J.N.'s IEP to reflect his attendance at the Charter School. (IHO Ex. 1 at 1.) At this meeting, the CSE determined that the Charter School program, which embedded related services within its curriculum, was meeting all of the student's educational needs. (Tr. at 61–62.) Accordingly, it terminated the SEIT and related services that had been recommended in the May 2007 IEP. (IHO Ex. 1 at 30.)

### 1. IHO Hearing

On April 8, 2008, the impartial hearing resumed to determine whether J.N.'s placement at the Charter School without SEIT and related services deprived J.N. of a FAPE.[9] (Tr. at 12.)

---

7. Evidently, the DOE's computer system did not recognize the Charter School at that time because it was under the purview of the State Department of Education. (IHO Ex. Fat 1.)

8. On October 10, 2007, the IHO issued an order effectuating the parties' stipulation that J.N. continue to receive the services recom-

mended by the September 2006 IEP for the pendency of the action. (IHO Decision at 3.)

9. Testimony was taken over the course of three days: April 8, 2008, May 29, 2008, and July 21, 2008. (Tr. at 12, 104, 220.)

On August 14, 2008, after hearing testimony from five witnesses and reviewing the documentary evidence submitted by the parties, the IHO concluded that J.N.'s placement at the Charter School, without related services, provided J.N. with a FAPE. (IHO Decision at 8–9.) This finding was based largely on testimony from Jamie Pagliaro, the Charter School's executive director. (*Id.*) Pagliaro testified that the Charter School employs a needs-driven approach, where each student has an individualized curriculum that embeds ABA strategies into every activity throughout the school day. (Tr. at 32, 61–62, 85.) Pagliaro acknowledged that many of the students received related services in an extra-curricular environment but expressed skepticism as to the educational necessity of such services:

> [T]here was some early autism research that suggested forty hours a week was a magical number, so I think many parents made the case that they get thirty hours a week of service at school, and that they are entitled to an additional ten hours a week of service.

(Tr. at 82.) Pagliaro stated that many parents depend on extra-curricular related services not because they furnish an educational benefit, but rather because they provide "structured time for their kids outside of the school day," something that can be difficult to find given the "level of challenge these children present." (Tr. at 82–83.)

Pagliaro further testified that J.N. has made "huge progress" since enrolling at the Charter School and stressed that, in his opinion, extra-curricular related services are not necessary to help J.N. benefit from special education. (Tr. at 69, 71.)

The IHO also cited the testimony of Julia Fisher, the Charter School's Director of Education. Fisher testified that J.N. has made "vast gains" since starting at the Charter School and that he was doing "very, very well." (IHO Decision at 8–9; Tr. at 224.) Like Pagliaro, Fisher testified that J.N. would continue to benefit from his program at the Charter School without SEIT and related services. (Tr. at 236.)

The IHO also found that the Charter School offered parent training that made J.N.'s SEIT service unnecessary. (IHO Decision at 9.) The IHO noted that the Charter School provides training and feedback for parents through monthly meetings at the school as well as monthly home visits and weekly notes to parents. (*Id.* at 3–4.)

Based on this testimony, the IHO concluded that J.N.'s needs were being addressed within the context of the Charter School's program. (*Id.* at 9.) The IHO found that placement at the Charter School did not arbitrarily reduce J.N.'s level of service, but rather offered a different model for provision of speech services, occupational therapy, physical therapy, and parent training. (*Id.*) The IHO found this embedded model sufficiently individualized and comprehensive to constitute a FAPE.[10] (*Id.*)

### 2. SRO Proceedings

Plaintiffs appealed the decision of the IHO to the SRO. On November 26, 2008, the SRO issued a decision finding that, as the 2007–2008 school year had already ended, the appeal was rendered moot.

---

10. In order to ensure that J.N.'s speech and language needs would be met by the Charter School's program, the IHO directed the Charter School's speech consultant to determine if J.N. required additional speech and language therapy. (IHO Decision at 10.)

After an evaluation on January 23, 2009, the speech consultant determined that J.N. did not require additional after-school speech and language services. (Decl. of Janice Silverberg, Ex. A, dated June 22, 2009.)

(SRO Decision at 12.) Noting that the student's educational needs were changing, the SRO declined to review the merits of Plaintiffs' claims. (*Id.*)

### 3. Proceedings in this Court

On January 5, 2009, Plaintiffs filed their Complaint with this Court. On April 22, 2009, the Court issued an Order, pursuant to the IDEIA's "stay put" provision, requiring the DOE to continue providing J.N. with SEIT services (twelve hours per week) and speech and language services (three hours per week) throughout the pendency of this appeal. (Doc. No. 30.) On May 26, 2009, Plaintiffs moved for modified *de novo* review of the administrative decisions (Doc. No. 37), and on June 22, 2009, Defendants cross-moved for summary judgment. (Doc. No. 42.) The motions were fully submitted on July 31, 2009.

## II. Standard of Review

■■■ IDEIA actions in federal court are frequently resolved on summary judgment motions. *J.R. v. Bd. of Educ. of City of Rye Sch. Dist.*, 345 F.Supp.2d 386, 394 (S.D.N.Y.2004). Unlike a typical motion for summary judgment, however, in an IDEIA action the existence of a disputed issue of fact will not defeat the motion. *P.K. ex rel. P.K. v. Bedford Cent. Sch. Dist.*, 569 F.Supp.2d 371, 382 (S.D.N.Y. 2008). Rather, the district court "must engage in an independent review of the administrative record and make a determination based on a preponderance of the evidence." *Gagliardo v. Arlington Cent. Sch. Dist.*, 489 F.3d 105, 112 (2d Cir.2007) (internal quotation marks omitted).

■■■ "The standard by which a district court reviews the final determination of the SRO has been characterized as modified *de novo* review." *Student X*, 2008 WL 4890440 at *3 (internal quotation marks omitted). "While federal courts do not simply rubber stamp administrative decisions, they are expected to give 'due weight' to these proceedings, mindful that the judiciary generally 'lack[s] the specialized knowledge and experience necessary to resolve persistent and difficult questions of educational policy.' " *Walczak*, 142 F.3d at 129 (quoting *Rowley*, 458 U.S. at 206, 102 S.Ct. 3034) (internal quotation marks omitted).

## III. Discussion

■■ "Two issues are relevant to a federal court's review of a challenged IEP: (1) whether the state complied with the procedural requirements of the IDEA, and (2) whether the challenged IEP was 'reasonably calculated to enable the child to receive educational benefits.' " *Walczak*, 142 F.3d at 129 (quoting *Rowley*, 458 U.S. at 206–07, 102 S.Ct. 3034).

### A. Procedural Review

■■ "The initial procedural inquiry in an IDEA case is no mere formality, as adequate compliance with the procedures prescribed would in most cases assure much if not all of what Congress wished in the way of substantive content in an IEP." *A.C. ex rel. M.C. v. Bd. of Educ. of The Chappaqua Cent. Sch. Dist.*, 553 F.3d 165, 172 (2d Cir.2009) (internal quotation marks omitted). However, not every "procedural error in the development of an IEP renders that IEP legally inadequate under the IDEA." *Grim v. Rhinebeck Cent. Sch. Dist.*, 346 F.3d 377, 381 (2d Cir.2003). Procedural errors will render an IEP inadequate only where they "impeded the child's right to a tree appropriate public education," "significantly impeded the parents' opportunity to participate in the decisionmaking process regarding the provision of a free appropriate public education to the parents' child," or "caused a depri-

vation of educational benefits." 20 U.S.C. § 1415(f)(3)(E)(ii).

The Complaint alleges that the May 8, 2007 IEP was procedurally deficient in four respects: (1) the CSE failed to make a specific placement recommendation; (2) no general education teacher was present at the IEP meeting; (3) no parent member was present at the IEP meeting; and (4) the IEP failed to make provision for a functional behavioral analysis. (Compl.¶ 20.)

### 1. Failure to Recommend a Specific School Placement

■ Plaintiffs argue that the CSE's failure to determine the specific school location at the May 2007 IEP meeting deprived the parents of meaningful participation in the development of J.N.'s IEP. (Pl's Mem. at 13–17.) By merely recommending a "generic 6:1:1 classroom setting without a specific placement or location," Plaintiffs argue, the IEP was procedurally inadequate. (*Id.* at 16.)

■ Plaintiffs' argument is without merit. As the United States Court of Appeals for the Second Circuit recently held, an IEP need not recommend a placement at a specific school in order to satisfy the IDEIA. *See T.Y. v. N.Y. City Dept. of Educ.*, 584 F.3d 412, 419 (2d Cir.2009). Rather, a student's "educational placement" for IEP purposes refers only to the "general educational program—such as the classes, individualized attention and additional services a child will receive—rather than the 'bricks and mortar' of the specific school." *Id.* Therefore, the CSE's failure to specify a school location does not, in and of itself, constitute a procedural deficiency.

Furthermore, the CSE's failure to recommend a specific school location is even less troubling here, where it is undisputed that J.N. was placed at the school of his parents' choice. Indeed, the record suggests that the only reason the Charter School placement was not reflected on the IEP was due to an administrative error with respect to the DOE's computer system. (IHO Ex. F at 1.) When the CSE reconvened in January 2008, the resultant IEP was updated to reflect J.N.'s placement at the Charter School. (IHO Ex. 1 at 1.) Because J.N.'s parents made the decision to send him to the Charter School, there is no merit to the argument that Plaintiffs were deprived of the opportunity to participate meaningfully in the May 2007 IEP meeting.

### 2. Absence of a General Education Teacher at the IEP Meeting

■ The Complaint alleges that the May 2007 IEP meeting was not properly constituted because there was no general education teacher present. (Compl. ¶ 20.) The IDEIA requires the presence of a general education teacher at an IEP meeting only if the "child is, or may be, participating in the regular education environment." 20 U.S.C. § 1414(d)(1)(B)(ii).

Here, Plaintiffs have not argued that J.N., who has been placed exclusively in specialized classes since beginning school, was being considered for participation in the regular education environment. On the contrary, during the May 2007 IEP meeting Plaintiffs informed the CSE of their intention to enroll J.N. at the Charter School. (Tr. at 253.) Because the Charter School offers no general education environment, the presence of a general education teacher at the IEP meeting was unnecessary. Moreover, Plaintiffs have not demonstrated that the absence of a general education teacher impeded their opportunity to participate in the CSE's decision-making process, given that Plaintiffs themselves decided to place J.N. at the Charter School. Accordingly, the absence of a general education teacher at the

May 2007 IEP meeting does not constitute a procedural defect.

### 3. Absence of a Parent Member at the IEP Meeting

Plaintiffs also argue that the May 2007 IEP meeting was improperly constituted because it did not include a parent member.[11] Plaintiffs, however, acknowledge that they waived the right to have a parent member participate in the May 2007 IEP meeting. (Compl. ¶ 20.) Plaintiffs have offered no evidence in support of their claim that, despite the parents' waiver, the DOE "failed to take appropriate steps ... to ensure the attendance" of a parent member. (*Id.*) Accordingly, the absence of a parent member at the May 2007 IEP meeting does not constitute a procedural violation.

### 4. Failure to Provide a Functional Behavioral Assessment

The IDEIA requires that, in developing an IEP for "a child whose behavior impedes the child's learning," the school district must "consider the use of positive behavioral interventions and supports, and other strategies, to address that behavior." 20 U.S.C. § 1414(d)(3)(B)(i). The Complaint alleges that the IEP is procedurally inadequate because the DOE failed to conduct a functional behavioral assessment ("FBA"), which is "the process of determining why the student engages in behaviors that impede learning and how the student's behavior relates to the environment." N.Y. Comp.Codes R. & Regs. tit. 8, § 200.1(r).

The failure to conduct an FBA does not render an IEP procedurally inadequate where the IEP provides strategies to address the student's behavior. *See A.C.*, 553 F.3d at 172. Here, an FBA was unnecessary because the entire Charter School program incorporates the ABA methodology, an individualized program developed for children with autism that teaches adaptive behavior through the use of positive reinforcement. (Tr. at 31, 207,) Further, Plaintiffs have not argued that J.N.'s behavior impedes his learning. Indeed, J.N.'s IEPs from January 2008 and May 2007 state that his behavior "does not seriously interfere with instruction" and that any behavioral issues "can be addressed by the special education classroom teacher." (IHO Ex. B at 4; IHO Ex. 1 at 4.) Accordingly, there is no evidence to suggest that the DOE's failure to conduct an FBA resulted in the denial of a FAPE.

### B. Substantive Review

The IDEIA requires school districts to provide each disabled student with an IEP that is "reasonably calculated to enable the child to receive educational benefits." *Rowley*, 458 U.S. at 207, 102 S.Ct. 3034. The IDEIA does not require the school district to " 'maximize the potential of handicapped children.' " *Walczak*, 142 F.3d at 130 (quoting *Rowley*, 458 U.S. at 199, 102 S.Ct. 3034). Rather, "a school district fulfills its substantive obligations under the IDEA if it provides an IEP that is likely to produce progress, not regression, and if the IEP affords the student with an opportunity greater than

---

**11.** In addition to the parents of the child for whom the IEP is being developed, the CSE is required to include a "parent member." N.Y. Comp.Codes R. & Regs. tit. 8, § 200.3(a)(i)(viii). A parent member is a parent of a child with a disability whose role at the IEP meeting is to provide support and information to the student's parents and advocate for the student's best interests. *See* New York State Education Department, *Guide to Quality Individualized Education Program (IEP) Development and Implementation*, February 2010, http://www.vesid.nysed.gov/specialed/publications/iepguidance/IEPguide Feb2010.pdf.

mere trivial advancement." *Cerra v. Pawling Cent. Sch. Dist.,* 427 F.3d 186, 195 (2d Cir.2005) (internal quotation marks omitted).

■ Plaintiffs argue that the Charter School placement without SEIT and related services is substantively inadequate to provide J.N. with a FAPE. (Pl's Mem. at 18.) Plaintiffs describe the Charter School as offering a "one size fits all" program that does not sufficiently address J.N.'s individual needs. (*Id.* at 19.)

The Court disagrees. Testimony at the administrative hearing established that J.N.'s individualized needs are being addressed by the Charter School's curriculum, which provides intensive ABA instruction throughout the school day. Pagliaro and Fisher testified that the Charter School develops an individualized academic program for each student based on that student's needs. (Tr. at 33, 85, 224.) For example, J.N.'s curriculum was tailored to address his deficits in language and social skills by emphasizing vocabulary development, ability to sustain eye contact, and spontaneous use of language. (Tr. at 48, 225.) To help students learn to generalize the skills they are developing, the instructors in each classroom rotate among the students every thirty to forty-five minutes. (Tr. at 35–36.) The Charter School also consults with a well-respected speech and language pathologist to ensure that its academic programs are effectively addressing the students' needs. (Tr. at 62, 65.) Further, the Charter School's teachers and administrators regularly collect and analyze data to measure each student's progress and make any necessary modifications to each child's program. (Tr. at 66–67, 242.)

The evidence suggests that the Charter School curriculum alone, without additional related services, is "likely to produce progress, not regression." *Cerra,* 427 F.3d at 195. Pagliaro and Fisher both testified that J.N. had made significant progress in developing language and social skills since enrolling at the Charter School and that related services were not necessary for J.N. to receive a meaningful benefit from the Charter School's curriculum. (Tr. at 69, 224.) While Plaintiffs argue that J.N.'s progress was due, in part, to the related services that he continued to receive under pendency (Pl.'s Mem. at 8), Plaintiffs have produced no persuasive evidence demonstrating that the discontinuation of related services would deprive J.N. of a FAPE. To the contrary, the evidence suggests that J.N.'s placement at the Charter School, where he is in a class of four children who receive intensive individualized instruction provided by four instructors, provides a greater opportunity for J.N. to progress than the placement reflected on the May 2007 IEP, which recommended J.N. attend a class of six children and two adults.

Plaintiffs have also questioned the efficacy of the Charter School's embedded approach given that over half of the students receive after-school related services. At the hearing, Pagliaro addressed this argument, testifying that while these services are not educationally necessary, some parents rely on them as a way to provide their children with structure outside of the school day. (Tr. at 82–83.) Pagliaro further testified that the notion that students at the Charter School need extra-curricular services comes from early autism research that suggested forty hours a week of services was a "magical number." (Tr. at 82–83.) The IHO found this testimony, when taken with Defendants' other evidence, sufficiently credible to determine that J.N.'s educational needs were being met through the Charter School. (IHO Decision at 9.)

Finally, Plaintiffs argue that the January 2008 IEP failed to provide adequate parent training and counseling, as New

York regulations require for parents of a child with autism.[12] The IHO found that a parent training provision was unnecessary, as the Charter School provides a "comprehensive parent training component" that satisfies the requirements of the regulation. (IHO Decision at 9.) The IHO's finding is supported by testimony at the hearing, which established that the Charter School provides a variety of outreach opportunities to parents including monthly clinic meetings at the school, monthly home visits by the teacher to provide the parents with training, and weekly notes sent home to the parents. (Tr. at 31–32; 36–39)

Defendants, therefore, have established by a preponderance of the evidence that the Charter School curriculum without SEIT and related services is reasonably calculated to enable J.N. to receive educational benefits. As the IHO found, the Charter School placement does not reduce J.N.'s level of service, but merely provides the services in a different manner. While Plaintiffs' evidence suggests that J.N. might benefit further from additional services, Plaintiffs have not established that those services are necessary components of a FAPE. *See Walczak*, 142 F.3d at 132 ("What the [IDEIA] guarantees is an appropriate education, not one that provides everything that might be thought desirable by loving parents.") (internal quotation marks omitted). Giving due weight to the findings of the IHO, the Court finds that the IHO's conclusions are supported by the record and that Plaintiffs have not produced evidence establishing that they were reached in error.

### C. Adjudication of Prongs II and III of the *Burlington–Carter* Test

Plaintiffs also argue that the IHO and SRO erred by failing to adjudicate Prongs II and III of the "*Burlington–Carter* test," a three-pronged analysis to determine whether a parent is entitled to reimbursement for a unilateral private placement. (Pl.'s Mem. at 23); *see Florence County Sch. Dist. Four v. Carter*, 510 U.S. 7, 12–13, 114 S.Ct. 361, 126 L.Ed.2d 284 (1993); *Burlington Sch. Comm. v. Dep't of Educ.*, 471 U.S. 359, 105 S.Ct. 1996, 85 L.Ed.2d 385 (1985).

 Pursuant to the IDEIA, parents dissatisfied with a proposed IEP may unilaterally remove their child from a public school, place the child in a private school they believe to be appropriate to the child's needs, and file a complaint with the state educational agency seeking reimbursement for the private school tuition. *See Cerra*, 427 F.3d at 192. A school district will be required to reimburse parents for unilaterally selected educational services if the parents can establish the three "*Burlington–Carter* factors": (1) the educational program recommended by the IEP was inappropriate to meet the child's needs; (2) the alternative placement or additional services selected by the parents were appropriate; and (3) equitable factors weigh in favor of reimbursement. *See A.D. v. Bd. of Educ. of City Sch. Dist. of City of N.Y.*, 690 F.Supp.2d 193, 204–05 (S.D.N.Y.2010) (citing *T.Y.*, 584 F.3d at 417).

Here, consideration of the second and third *Burlington–Carter* factors is wholly unnecessary because Plaintiffs are not seeking reimbursement for a unilateral private placement secured during the pendency of this action. On the contrary, it is undisputed that the Charter School is a public school and that J.N. has been re-

---

**12.** Pursuant to N.Y. Comp.Codes R. & Regs. tit. 8, § 200.13(d), "[p]rovision shall be made for parent counseling and training ... for the purpose of enabling parents to perform appropriate follow-up intervention activities at home."

ceiving SEIT and related services at Defendant's expense pursuant to the IDEIA's "stay put" provision. Therefore, J.N.'s parents have incurred no out-of-pocket expense for private services for which they have not already been deemed entitled to reimbursement.

Because Plaintiffs are merely seeking to maintain the related services they are currently receiving at DOE's expense pursuant to the IDEIA's pendency provisions, the *Burlington–Carter* test does not apply.

### IV. CONCLUSION

For the reasons stated above, the Court finds that (1) Defendants complied with the procedural requirements of the IDEIA, and (2) the May 2007 and January 2008 IEPs were reasonably calculated to enable J.N. to receive educational benefits. Accordingly, Plaintiffs' motion for modified *de novo* review is denied, and Defendant's motion for summary judgment is granted. The Clerk of the Court is respectfully directed to terminate the motions located at docket numbers 37 and 42, and to close this case.

SO ORDERED.