**In the Matter of R.C. and L.C., on behalf of M.C., Plaintiff,**

v.

**BYRAM HILLS SCHOOL DISTRICT, Defendant.**

No. 11 Civ. 3938(GBD).

United States District Court, S.D. New York.

Nov. 16, 2012.

---

Neal Howard Rosenberg, Law Office of Neal Rosenberg, New York, NY, for Plaintiff.

Andrea Green, Kehl, Katzive & Simon, LLP, New York, NY, for Defendant.

## MEMORANDUM DECISION AND ORDER

GEORGE B. DANIELS, District Judge:

Plaintiffs R.C. and L.C., on behalf of their son, M.C., bring this action pursuant to the Individuals with Disabilities Education Improvement Act, 20 U.S.C. §§ 1400 *et seq.* (the "IDEA") against Defendant Byram Hills School District (the "District"). Plaintiffs seek reversal of the February 9, 2011 administrative decision of the State Review Officer (the "SRO") denying Plaintiffs' request for tuition reimbursement for M.C.'s private placement at the Eagle Hill School ("Eagle Hill") during the 2008–09 and 2009–10 school years. The SRO affirmed the Impartial Hearing Officer's (the "IHO") decision denying Plaintiffs' request for reimbursement for the 2008–09 school year, but reversed the IHO's decision granting Plaintiffs' request for reimbursement for the 2009–10 school year.

Plaintiffs have moved for summary judgment granting their request for tuition reimbursement for both school years. Defendant has cross-moved for summary judgment upholding the SRO's decision and dismissing Plaintiffs' complaint.

## I. STATUTORY FRAMEWORK

### THE IDEA

"Congress enacted the IDEA to 'ensure that all children with disabilities have available to them a free appropriate education ... designed to meet their unique needs ... [and] to ensure that the rights of children with disabilities and parents of such children are protected.'" *M.H. v. New York City Dep't of Educ.*, 685 F.3d 217, 223 (2d Cir.2012) (quoting 20 U.S.C. § 1400(d)(1)(A)-(B)). "To meet the IDEA's requirements, a school district's program must provide 'special education and related services,' be tailored to meet the unique needs of a particular child, and be reasonably calculated to enable the child to receive educational benefits." *Gagliardo v. Arlington Cent. Sch. Dist.*, 489 F.3d 105, 107 (2d Cir.2007) (internal quotations omitted).

"Such services must be administered according to an individualized education program [("IEP")] which school districts must implement each year for each student with a disability." *M.H.*, 685 F.3d at 224 (internal citations omitted). An IEP is a written statement that sets out the student's present educational performance, establishes annual and short-term objectives for improvements in that performance, and describes the specially designed instruction and services that will enable the child to meet those objectives. *Id.* (citing *D.D. ex rel. V.D. v. New York City Bd. of Educ.*, 465 F.3d 503, 507–08 (2d Cir.2006)).

An IEP is adequate under the IDEA if it is "likely to produce progress, not regression, and if the IEP affords the student with an opportunity greater than mere trivial advancement." *T.P. ex rel. S.P. v. Mamaroneck Union Free Sch. Dist.*, 554 F.3d 247, 254 (2d Cir.2009) (internal quotation marks omitted). An IEP is not required to "furnish every special service necessary to maximize each handicapped child's potential." *Grim v. Rhinebeck Cent. Sch. Dist.*, 346 F.3d 377, 379 (2d Cir.2003) (internal quotations omitted). Under an IEP, "education [must] be provided in the 'least restrictive setting consistent with a child's needs.'" *Id.* (internal quotations omitted).

"Since New York State receives federal funds under IDEA, it is obliged to comply with the requirements of this law. To

meet these obligations and to implement its own policies regarding the education of disabled children, the state has assigned responsibility for developing appropriate IEPs to local Committees on Special Education [ ("CSEs") ], the members of which are appointed by school boards or the trustees of school districts." *Walczak v. Fla. Union Free Sch. Dist.*, 142 F.3d 119, 123 (2d Cir.1998) (internal citations omitted). "In developing a particular child's IEP, a CSE is required to consider four factors: (1) academic achievements and learning characteristics, (2) social development, (3) physical development, and (4) behavioral needs." *Gagliardo*, 489 F.3d at 107–08 (internal citations omitted). "The CSE must also be mindful of the IDEA'S strong preference for 'mainstreaming' or educating children with disabilities '[t]o the maximum extent appropriate' alongside their non-disabled peers." *M.H.*, 685 F.3d at 224. (internal citations omitted).

In New York, if a parent "believe[s] an IEP is insufficient under the IDEA," he or she "may challenge it in an 'impartial due process hearing,' 20 U.S.C. § 1415(f) before an [Impartial Hearing Officer, or 'IHO'] appointed by the local board of education." *Grim*, 346 F.3d at 379 (quoting N.Y. Educ. Law §§ 4404(1)). At the hearing before the IHO, "the school district has the burden of demonstrating the appropriateness of its proposed IEP." *Id.* The IHO's decision may then be appealed to a State Hearing Officer ("SRO"). *Id.*

A party "aggrieved" by an SRO ruling, in turn, "shall have the right to bring a civil action" in state or federal court. 20 U.S.C. § 1415(i)(2)(A). "When such an action is brought in federal district court, the court reviews the records of all administrative hearings and must hear additional evidence if so requested by either of the parties." *M.H.*, 685 F.3d at 225 (internal citations omitted). "The court typically considers the propriety of the IEP on the parties' cross motions for summary judgment." *Id.*

## II. FACTUAL BACKGROUND

### A. M.C.'s Educational History and Disability

M.C. is a 14–year old student classified as learning disabled for the purposes of the IDEA, who resides in the Byram Hills School District. Def.'s 56.1 Stmt. ¶ 4; Pl.'s 56.1 Resp. ¶ 1; School District ("SD") Ex. 1, at 2. M.C. attended kindergarten at a District School from 2003–04, where he received special education services. SD Ex. 50, at 2. Plaintiffs then placed M.C. at the Windward School, a private special education school, from 2004–07 for first through third grade. SD Ex. 50, at 20. In 2007–08, Plaintiffs placed M.C. at Eagle Hill, a private school for children with learning issues located in Greenwich, Connecticut, for the fourth grade. SD Ex. 2.

### B. 2008 CSE Evaluation and IEP

In a letter to the District dated April 2, 2008, Plaintiffs requested a CSE meeting to develop an IEP for M.C. SD Ex. 37. Plaintiffs indicated that they were willing to consider recommendations made by the CSE regarding an educational program for M.C. in a District School. SD Ex. 39. On June 27, 2008, the CSE convened to develop an IEP for M.C. for the 2008–09 school year. SD Ex. 50. The CSE chairperson, a District special education teacher, a parent representative, M.C.'s parents, a District fourth grade regular education teacher, a District speech-language pathologist, and a District psychologist attended the meeting. SD. Ex. 50, at 1. M.C.'s Eagle Hill advisor participated in the meeting by phone. *Id.*

During the meeting, the CSE considered a number of reports and evaluations of

M.C.[1] including (1) a May 2008 social history update prepared by M.C.'s parents; (2) a May 2008 evaluation of M.C. by the District's Speech/Language Pathologist; (3) a June 2008 academic and social/emotional progress report from MC's educational advisor at Eagle Hill; (4) a June 2007 occupational therapy ("OT") evaluation report; (5) a June 2008 educational and psychological evaluation report by the District; (6) a June 2008 classroom observation; (7) a July 2000 social history; and (8) an August 2007 physical examination report. SD Ex. 50, at 2–48; Ex. 51 at 9. In coordination with these reports and evaluations, the CSE also considered M.C.'s test scores on multiple exams in language, reading, mathematics, vocabulary, and writing, among other subjects, including individual standardized testing. SD Ex. 50.

The June 2008 CSE then recommended an IEP including: special education language arts and math classes with a student to teacher ratio of 8:1:1 (eight students, one teacher, one aide); a 3:1 aide during general education classes, specials, lunch, and recess for 45–minute sessions per day; one daily 45–minute session of individual resource room services; one 45–minute session of group counseling per week; one 45–minute session of individual OT per week; one 30–minute session per month of OT consultation; one 45–minute session per week of individual physical therapy (PT); one 30–minute session per month of PT consultation, two 45–minute sessions per week of group speech-language therapy within his special class, one 45–minute session per week of individual speech language therapy, and adapted physical education. SD Ex. 51.

The IEP contained 48 annual goals in the areas of study skills, reading, writing, math, speech-language, social/emotional/behavioral, and motor skills. *Id.* The IEP also included testing accommodations which provided M.C. with extended time, a separate testing location, having directions read, repeated and explained to him, and repetition of oral/listening comprehension questions. *Id.*

On July 18, 2008, Plaintiffs emailed the CSE chairperson and requested a sample detailed prototypical program that would demonstrate how the District would provide all of the IEP services in a typical week. SD Ex. 57. By letter dated July 29, 2008, the CSE chairperson sent a sample schedule. SD Ex. 58. Upon reviewing the program, on August, 15, 2008, Plaintiffs expressed concern to the assistant director of social services for the District ("Assistant Director") that the level of services recommended by the 2008 IEP could *not be provided in a school week.* SD. Ex. 59. Plaintiffs noted several differences between the sample program and the recommended IEP. *Id.* at 1. Plaintiffs then indicated that M.C. would return to Eagle Hill in Fall 2008 and they would seek tuition reimbursement. *Id.* at 2.

By letter dated August 29, 2008, the Assistant Director sent Plaintiffs a revised schedule, and clarified that M.C. would receive the recommended amount of related services, as well as social skills training, and that M.C.'s study skills would be addressed by multiple instructors. SD Ex. 61. The Assistant Director also sent Plaintiffs a procedural safeguards notice. *Id.* By letter dated September 30, 2008, Plaintiffs indicated that they "remain[ed] unhappy" with the proposed program for M.C, and that they reserved the right to

---

1. The CSE was provided with the packet of materials to consider prior to the CSE meeting. SD Ex. 50, at 20–21.

retain an attorney and file a due process complaint. SD Ex. 62, at 1.

### C. 2009 CSE Evaluation and IEP

In February 2009, the District sent Plaintiffs a letter notifying them of M.C.'s annual review and upcoming CSE meeting. SD Ex. 19. On June 8, 2009, a CSE subcommittee convened for M.C.'s annual review and to develop his IEP for the 2009–10 school year. SD Ex. 12. The CSE subcommittee chairperson, a District school regular education teacher, a District school special education teacher, a speech-language pathologist, a District school psychologist, and M.C.'s mother attended. *Id.* at 9. M.C.'s father, the Eagle Hill advisor, and M.C.'s Eagle Hill tutorial teacher participated in the meeting by telephone. *Id.*

During the meeting, the subcommittee considered the following reports and evaluations: (1) a District special education teacher's May 2009 observation of M.C. during a math class at Eagle Hill; (2) a December 2008 report of M.C.'s academic and social/emotional progress by M.C.'s teachers at Eagle Hill; (3) a December 2008 speech-language report by the Eagle Hill speech-language pathologist; (4) the District's June 2008 educational and psychological evaluation reports; (5) the District's May 2008 speech-language evaluation report; (6) the May social history update; (7) the August 2007 physical examination report; and (8) the June 2007 OT evaluation report. SD Exs. 12, at 10; 50, at 2–5, 9–19, 20–24; 63, at 1–16. The June CSE subcommittee discussed M.C.'s needs and evaluated his academic and social/emotional performance, health and physical development. SD Ex. 12, at 3–9.

The June 2009 CSE then recommended that M.C.'s IEP include: a 12:1 special class for language arts, math, science, and social studies; related services of one counseling session per week in a group of five for 45 minutes; one OT session per week individually for 45 minutes; one OT consultation per month for 30 minutes; one PT session per week individually for 45 minutes; one PT consultation per month for 30 minutes; two speech-language therapy sessions per week in a group of five within his special class for 45 minutes; one speech-language therapy session per week individually for 45 minutes, and adapted physical education. SD Ex. 12, at 1–2.

The CSE also recommended modifications and accommodations to complement M.C.'s classes including: providing refocusing and redirection; preferential seating; providing information in small sequential units; checking for understanding; repeating oral directions; providing M.C. additional time to process responses; teaching abstract concepts concretely; clarifying directions; use of graphic organizers; and use of visuals and/or manipulatives. *Id.* The IEP again included testing accommodations which provided M.C. with extended time for exams, testing at a separate location, having directions read, repeated, and explained and repetition of oral/listening comprehension questions. *Id.* The June 2009 CSE subcommittee also considered, but rejected, placing M.C. in a general education setting with support services and a full-time special education program. SD Ex. 12, at 11. The IEP contained 47 annual goals in the areas of study skills, reading, writing, math, speech-language, social/emotional/behavioral, and motor skills. SD Ex. 12, at 11–19.

The CSE chairperson then sent the IEP annual goals to M.C.'s Eagle Hill advisor for input. SD Ex. 26. M.C.'s Eagle Hill advisor, along with other Eagle Hill staff revised those goals and returned them to the CSE chairperson. *Id.* at 1–9. Those

revisions were included in the June 2009 IEP. SD Ex. 32, at 10–18; *see* SD Ex. 26, 27. On July 27, 2009, the District sent Plaintiffs a Committee Recommendation for Continuation of Services letter, as well as M.C.'s June 8, 2009 IEP and sixth grade class profiles. SD Ex. 33 at 1. The District also indicated to Plaintiffs that the District had worked collaboratively with Eagle Hill to develop the annual goals for the June 2009 IEP.[2] *Id.*

## III. PROCEDURAL BACKGROUND

On May 7, 2010 Plaintiffs filed a Due Process Complaint Notice requesting an impartial hearing and alleging that the District denied M.C. a free, appropriate education ("FAPE"). SD Ex. 1. Plaintiffs alleged that the 2008–09 and 2009–10 District programs would not confer a meaningful educational benefit for M.C. because, *inter alia,* (1) M.C. could not excel in a general education environment, (2) the special education classes designated were too large and would include students of varying levels of functioning and impairments, who are very different from M.C; (3) M.C. would be pulled out of his classes or have professionals pushed into his classes throughout the day; (4) M.C. has complex learning impairments that require a fully comprehensive, individualized, full-time special education program with a continuous small student to teacher ratio. *Id.* Therefore, Plaintiffs sought tuition reimbursement for M.C.'s placement at Eagle Hill during the 2008–09 and 2009–10 school years. *Id.*

### A. IHO Determination

The IHO conducted a hearing on July 21, July 22, August 17 and August 19, 2010. *See* IHO Hr'g Tr. at 1–641. In a decision dated November 4, 2010, the IHO determined that M.C.'s IEP for the 2008–09 and 2009–10 school years accurately and comprehensively set forth the student's testing results, described his current levels of performance, and identified and summarized his special education needs. IHO Decision[3] at 43. The IHO found that M.C. had significant delays in language skills and academic skills; difficulties with attention, distractibility, impulsivity, and anxiety; and challenges with social skills and reading social cues. *Id.*

The IHO then determined that the District offered M.C. a FAPE for the 2008–09 school year. *Id.* at 44–46. Specifically, the IHO found that the IEP's mandate of special language arts and math classes, with support provided by the special education teacher and aide, would address M.C.'s academic and language delays. *Id.* at 44. The IHO also relied upon the District's witnesses' explanation that the special education teacher would modify the curriculum for M.C. as necessary, and differentiate instruction for him to ensure that he was making progress. *Id.* The IHO also determined that the special education teacher could address M.C.'s impulsivity and attention issues through cuing and behavior contracts, among other methods. *Id.*

The IHO found that M.C.'s placement in larger mainstream classes for science and social studies was appropriate because he would have the support of an aide. *Id.* The IHO credited the testimony of the District's witnesses that M.C.'s distractibil-

---

2. The record is unclear as to whether Plaintiffs ever informed the District that M.C. would not be attending a District school for the 2009–10 year. The CSE Chairperson testified that she did not hear from Plaintiffs after sending the July 27, 2009 letter. M.C.'s father testified that he notified the District by letter.

3. The IHO Decision is attached to the Complaint as Exhibit B.

ity issues could be addressed with techniques that have been previously used with other students. *Id.* The IHO also determined that the individual resource room and an extensive array of program modifications would provide additional support to address M.C.'s academic delays as well as his behavioral needs. *Id.* The IHO also considered M.C.'s scores on the W–J Tests of Achievement, the WISC–IV and Eagle Hill testing, and determined that the CSE reasonably concluded that M.C. could function in a program with the levels of support recommended in the IEP. *Id.*

The IHO rejected Plaintiffs' arguments that the IEP did not address M.C.'s impulsivity, distractibility, and anxiety. *Id.* at 46. The IHO found that the special education teachers in M.C.'s smaller classes would provide the individualized attention and behavioral support that M.C. requires. *Id.* The IHO further found that the aide in M.C.'s mainstream classes would provide the support M.C. needed to remain on task in the classroom and reduce his impulsivity. *Id.* The IHO also determined that M.C. would be able to transition in the general school environment because M.C. was able to transition between classroom buildings at Eagle Hill. *Id.*

The IHO then determined that the District did not offer M.C. a FAPE for the 2009–10 school year. *Id.* at 47. The IHO found that the District provided no justification for the increase in M.C.'s class size from eight to twelve students, without the support of a classroom aide, other than to state that it would foster M.C.'s independence. *Id.* The IHO found that M.C. was not ready for such independence and still required the supports of smaller classes and more direct teacher attention. *Id.* The IHO also determined that the CSE had eliminated M.C.'s 1:1 resource room without explanation. *Id.* She found that the record provided little detail about the

sixth grade program at the District's middle school and how M.C.'s IEP would have been implemented in that program. *Id.*

The IHO then determined that Plaintiffs were entitled to tuition reimbursement for the 2009–10 school year. *Id.* at 49–50. The IHO found that the evidence demonstrated that Eagle Hill was an appropriate placement for M.C. because it provided small classes which targeted M.C.'s specific academic needs. *Id.* at 49–50. The IHO determined that Eagle Hill specifically and directly addressed the student's pragmatic language and social skills deficits, as well as his impulsivity and anxiety. *Id.* The IHO also concluded that M.C. had made progress while attending Eagle Hill. *Id.* at 52. The IHO then determined that Plaintiffs cooperated with the District and provided sufficient notice to the District of their intent to unilaterally place M.C. at Eagle Hill, and thus were entitled to reimbursement for the 2009–10 school year. *Id.* at 53–54.

## B. SRO Determination

Plaintiffs appealed the portion of the IHO's decision which denied their request for reimbursement for the 2008–09 year to New York State's Office of State Review. SRO Decision at 1. Plaintiffs alleged that (1) the impartial hearing officer erred in refusing to consider the District's compliance with procedural requirements; (2) the IEP created for the student failed to address the complexity of the student's needs; and (3) the proposed placement for the 2008–09 constituted a denial of a FAPE. *Id.* at 16. The District cross appealed the IHO's determination that it failed to provide a FAPE during the 2009–10 school year. *Id.* at 17.

On February 9, 2011, the SRO issued a decision that the District had offered M.C. a FAPE for both the 2008–09 and 2009–10 school years. First, the SRO rejected

Plaintiffs' arguments regarding alleged procedural defects, and found that those defects were not alleged in their due process complaint. *Id.* at 20. Therefore, the IHO appropriately did not consider them. *Id.*

The SRO then determined that the IHO correctly found that the District offered M.C. a FAPE for the 2008–09 school year in the least restrictive environment. *Id.* at 24. The SRO found that the IEP identified the student's academic, motor, and social/emotional/behavioral needs, and contained annual goals to address those needs. *Id.*

With respect to M.C.'s academic needs, the SRO determined that the IEP included annual goals designed to assist M.C. in improving (1) reading comprehension by reading, paraphrasing, making verbal statements, and answering questions regarding the main idea of a passage; (2) math skills by requiring M.C. to identify patterns in five number sequences, learn addition and subtraction facts, and solve both single digit multiplication problems and math word problems; and (3) speech-language by targeting receptive, expressive, and pragmatic language skills. *Id.* at 21. The SRO considered testimony from a District special education teacher and general education teacher illustrating how District staff could offer M.C. these and other program modifications in a way that addressed his need for "a different way of being taught." *Id.* at 22. Based on this testimony, the SRO determined that the District was able to offer program modifications and accommodations to appropriately address M.C.'s needs as identified in M.C.'s IEP. *Id.*

With respect to M.C.'s emotional and behavioral needs, the SRO determined that the IEP included goals that required the student to interact in a socially acceptable manner with peers and to reduce calling out in class. *Id.* at 21. The SRO credited testimony from the District regular education teacher that students are provided with verbal cues, manipulative chips to track student questions/comments, a silent signal by teachers, and sticky notes for students to write down their questions, in order to reduce calling out. *Id.* at 22. The SRO also noted that the District offered testimony that it could address student behavior, including impulsivity, through behavioral contracts, breaks, choices/options regarding instructional activities, a token system, cues, material broken down, and communication with parents. *Id.* The SRO found that these modifications were sufficient and that M.C. did not need a behavioral intervention plan. The SRO also found that M.C. was offered weekly counseling sessions to address his needs in attention, impulsivity, anxiety and social skills. *Id.*

The SRO also determined that M.C. could progress in the class sizes prescribed by the IEP. *Id.* at 21–22. Specifically, the SRO noted that there was testimony that M.C. would be supported by a team of staff, including a 3:1 aide during his general education classes, which would provide small group instruction and modified instructional materials. *Id.* The SRO also considered that the IEP provided M.C. with a resource room on an individual basis to provide additional support. *Id.* at 22. The SRO rejected Plaintiffs' arguments that M.C.'s exposure to large disorderly crowds in the general education environment during lunch, recess, art, music, physical education, and in hallways during transitions would preclude M.C. from receiving educational benefits. *Id.* at 23. The SRO noted that there was evidence that the student participated on the basketball team and ultimate frisbee team at Eagle Hill, and also transitioned well between classes there. *Id.*

The SRO also rejected Plaintiffs argument that the District would not have grouped M.C. with similarly functioning peers for his special education classes. *Id.* The SRO found that the hearing record reflected that M.C.'s special education classes were comprised of students with similar educational classifications of learning disabilities, social/emotional functioning, other health impairments, and speech and language impairments. *Id.* The SRO also noted that the class profile included students with similar scores on relevant examinations. *Id.* Thus, the SRO found that based upon the 2008–09 class profiles for M.C.'s special education classes, and testimony from the District fifth grade special education teacher, M.C. would have been suitably grouped in his classes for instructional purposes. *Id.* at 24.

The SRO then found that the hearing record did not support the IHO's determination that the District's recommended program for the 2009–10 did not offer M.C. a FAPE. *Id.* at 25. The SRO found that the June 2009 IEP accurately described the student's academic, social/emotional/behavioral, and motor needs. *Id.* The SRO then found that the annual goals identified in the IEP targeted those needs. *Id.* The SRO also found that the hearing record evidence showed that based upon M.C.'s progress over the year prior, the District provided suitable program modifications to meet M.C.'s needs in the least restrictive environment. *Id.*

With respect to M.C.'s academic needs, the SRO noted that both the parents' reports and testing demonstrated that M.C. made progress in mathematics, writing, verbal and reading comprehension skills, and speech language skills. *Id.* at 25. Thus, the SRO found that MC's annual goals regarding these subjects were appropriately modified. *Id.* at 26. Specifically, the SRO noted that the SCE's recommendation of two periods per day of a 45–minute 12:1 special language arts instruction and one hour per day of 12:1 special math class instruction was appropriate. *Id.* Although the SRO noted the change in M.C.'s placement from a 8:1:1 placement to a 12:1 placement for special education classes, he determined that the CSE committee recommended the change based upon evidence that M.C. exhibited some independent skills in those areas. *Id.* at 27. The SRO also found that the CSE subcommittee decision that M.C. receive special education classes in social studies and science instruction was warranted. *Id.* at 27. The SRO accepted the District representative's testimony that the curricula of those subjects increased in difficulty from the fifth to sixth grade, and so M.C. required special education classes in those areas. *Id.* at 27.

The SRO also credited evidence that M.C. infrequently exhibited difficulty in following classroom procedure; never exhibited difficulty with organizational skills; exhibited an ability to work independently; and never exhibited difficult in changing tasks. *Id.* In addressing Plaintiffs' argument that a 12:1 setting was too large for M.C, the SRO noted that the IEP provided numerous program modifications to assist his learning in spite of his impulsivity, anxiety, attention difficulties, language deficits, and problems with nonverbal communications. *Id.* at 27–28. The SRO also found that the IEP addressed M.C.'s social/emotional needs because it offered a 45–minute group counseling session each week, as well as social skills annual goals to be evaluated by a psychologist and a service provider. *Id.* at 28.

The SRO found that the CSE made appropriate recommendations in M.C.'s June 2009 IEP, and that nothing in that record indicated that the District could not implement that IEP. *Id.* Further, the SRO

determined that the CSE recommendations would allow M.C. to attend his home school and interact with his nondisabled peers, in the least restrictive environment. *Id.*

Having determined that the 2008–09 and 2009–10 IEPs and corresponding District programs offered M.C. a FAPE, the SRO found it unnecessary to reach the issue of the appropriateness of Eagle Hill as a placement for M.C. *Id.*

On June 9, 2011, Plaintiffs commenced this action appealing the SRO Decision.

## IV. STANDARD OF REVIEW

"Summary judgment in the context of the IDEA involves more than looking into disputed issues of fact; rather, it is a 'pragmatic procedural mechanism' for reviewing administrative decisions." *A.C. ex rel. M.C. v. Bd. of Educ.,* 553 F.3d 165, 171 (2d Cir.2009) (quoting *Lillbask ex rel. Mauclaire v. Conn. Dep't of Educ.,* 397 F.3d 77, 83 n. 3 (2d Cir.2005)). "[B]asing its decision on the preponderance of the evidence, the court is required to grant such relief as the court determines is appropriate." 20 U.S.C. § 1415(i)(2)(C)(iii). **Deference Owed to Administrative Findings**

It is well established that "the role of the federal courts in reviewing state educational decisions under the IDEA is circumscribed." *Gagliardo,* 489 F.3d at 112 (internal quotation marks omitted). Courts "must engage in an independent review of the administrative record and make a determination based on a 'preponderance of the evidence,'" *id.;* but such review "is by no means an invitation to the courts to substitute their own notions of sound educational policy for those of the school authorities they review," *Bd. of Educ. of Hendrick Hudson Cent. Sch. Dist. v. Rowley,* 458 U.S. 176, 206, 102 S.Ct. 3034, 73 L.Ed.2d 690 (1982). Rather,

a court must give "due weight" to the administrative proceedings. *Gagliardo,* 489 F.3d at 113 (internal quotation marks omitted).

The Second Circuit Court of Appeals recently clarified the deference owed to administrative determinations in the context of the IDEA. *See M.H.,* 685 F.3d at 244. "Courts generally defer to the final decision of the state authorities, even where the reviewing authority disagrees with the hearing officer." *Id.* at 241. (internal quotations omitted). "If the SRO's decision conflicts with the earlier decision of the IHO, the IHO's decision may be afforded diminished weight." *Id.* (internal citations omitted). "Deference is particularly appropriate when ... the state hearing officers' review has been thorough and careful." *Id.* (internal citations omitted). *Id.*

Courts may not "make subjective credibility assessment[s]" or "ch[oose] between the views of conflicting experts on ... controversial issue[s] of educational policy ... in direct contradiction of the opinions of state administrative officers who ha[ve] heard the same evidence." *Grim,* 346 F.3d at 383. In addition, administrative determinations that are "based on [the officers'] substantially greater familiarity with the evidence and the witnesses than the reviewing court"—*e.g.* those regarding "the substantive adequacy of an IEP" or "an appropriate educational methodology"—should be afforded more weight. *M.H.,* 685 F.3d at 244. "[T]he district court should afford more deference when its review is based entirely on the same evidence as that before the SRO than when [it] has before it additional evidence that was not considered by the state agency." *Id.*

**Issues for Judicial Review**

The "IDEA established a two-part inquiry for courts reviewing [state] administra-

tive determinations" under the IDEA. *Grim*, 346 F.3d at 381. First, the court asks whether "the State complied with the procedures set forth in the Act." *Id.* Second, the court asks whether the IEP "developed through the Act's procedures [is] reasonably calculated to enable the child to receive educational benefits." *Id.* (quoting *Rowley*, 458 U.S. at 206–07, 102 S.Ct. 3034). If an IEP is deficient, either procedurally or substantively, then the court asks "whether the private schooling obtained by the parents [for the child] is appropriate to the child's needs." *T.P.*, 554 F.3d at 252.

### Procedural Compliance

A procedural error will only render an IEP legally inadequate if the alleged inadequacies, "(i) impeded the child's right to a [FAPE]; (ii) significantly impeded the parents' opportunity to participate in the decisionmaking process regarding the provision of a [FAPE] to the parents' child; or (iii) caused a deprivation of benefits." 20 U.S.C. § 1415(f)(3)(E)(ii).

Procedurally, an IEP must contain: (1) the student's present levels of academic achievement and functional performance; (2) measurable annual goals for the student; (3) the method used to measure the student's progress toward those goals; (4) the special education and related services that the IEP recommends; (5) an explanation of the extent to which the student will be educated with "nondisabled" peers; (6) the reasons for any alternative assessments; and (7) the start date for recommended services, their duration, and their frequency. 20 U.S.C. § 1414(d)(1)(A); N.Y.C.R.R. tit. 8 § 200.4(d)(2).

### Substantive Compliance

The IDEA does not articulate any specific level of educational benefits that must be provided through an EIP or mandate that states maximize the potential of handicapped children. *M.H.*, 685 F.3d at 245.

Instead, the IDEA provides only for a basic floor of opportunity … consisting of access to specialized instruction and related services which are individually designed to provide educational benefit to the handicapped child. *Rowley*, 458 U.S. at 201, 102 S.Ct. 3034. An IEP must be "likely to produce progress, not regression" and provide an opportunity for more than "trivial advancement." *Walczak*, 142 F.3d at 130 (internal quotation marks omitted).

### Appropriateness of Alternative Placement

If the IEP is either procedurally and/or substantively deficient, then "the burden shifts to the parents to demonstrate that the school in which they have chosen to enroll their child is appropriate." *Gagliardo*, 489 F.3d at 112. The "unilateral private placement is only appropriate if it provides education instruction *specifically* designed to meet the unique needs of a handicapped child," not where "the chief benefits of the chosen school are the kind of … advantages … that might be preferred by parents of any child, disabled or not." *Id.* (emphasis in original).

## V. ALLEGED DEFICIENCIES

Plaintiffs allege that Defendants failed to comply with both the procedural and substantive requirements of IDEA in creating an IEP for M.C. for the 2008–09 and 2009–10 school years, and thus denied him a FAPE.

### A. Procedural Deficiencies Not Raised in Due Process Complaint

Plaintiffs allege that in developing M.C.'s IEP for the 2008–09 school year, Defendant failed to consider adequate documentation of M.C.'s history of medical treatment and evaluations. Plaintiffs claim that the resulting 2008–09 IEP inaccurately reflected the complexity of his

needs. Plaintiffs also allege that Defendants denied Plaintiffs a full and fair opportunity to participate in the creation of M.C.'s IEP for 2009. Specifically, Plaintiffs contend that the final IEP was not created at the June 2009 IEP meeting at which they were present, and neither Plaintiffs nor participants in that meeting could comment on or object to the IEP, nor effectively participate in the creation of goals. Plaintiffs allege that both of these procedural defects denied M.C. a FAPE.

As noted in both the IHO and SRO's decisions, Plaintiffs did not allege these procedural defects in their due process complaint. *See* SRO Decision at 20; IHO Decision at 42 n. 15. The party which requested "the due process hearing shall not be allowed to raise issues at the due process hearing that were not raised in the [impartial hearing request], unless the other party agrees otherwise."[4] *M.H.,* 712 F.Supp.2d at 159 (quoting 20 U.S.C. § 1415(f)(3)(B)). Accordingly, these alleged deficiencies were not properly raised in this proceeding.

## B. Alleged Deficiencies in IEP for 2008–09 School Year

### Failure to Create Goals Addressing Anxiety, Distractibility and Impulsivity

■ Plaintiffs allege that the CSE failed to create goals addressing M.C.'s struggles with anxiety, distractibility and impulsivity. However, the SRO specifically found that M.C.'s 2008 IEP included "annual goals targeting the student's anxiety and impulsivity that required the student to maintain his attention during individual and small group activities, and to use strategies such as self-talk to reduce text

anxiety." SRO Decision at 21. The SRO also found that "regarding the student's social/emotional/behavioral needs, the IEP included annual goals that required the student to interact in a socially acceptable manner with peers and reduce calling out in class. *Id.* The SRO determined that "[g]roup counseling was available to the student once a week to address his needs in areas such as attention, impulsivity, anxiety, and social skills." *Id.* "Whether a procedural or a substantive issue—the sufficiency of goals and strategies in an IEP is precisely the type of issue upon which the IDEA requires deference to the expertise of the administrative officers." *Grim,* 346 F.3d at 382. Thus deference to the SRO's well-supported decision on this issue is warranted.

### Lack of a Behavioral Intervention Plan

The IDEA requires that when a student's behavior impedes the child's learning or that of others," the CSE "consider the use of positive behavioral interventions and supports, and other strategies, to address that behavior." 20 U.S.C. § 1414(d)(3)(B)(i). This mandate is often carried out through the development of a functional behavioral assessment, which provides detailed information about a student's problem behaviors, and a behavioral intervention plan ("BIP"), which provides strategies to reduce those behaviors. *See* 8 N.Y.C.R.R. § 200.22(a)-(b). However, failure to create a BIP does not render an IEP procedurally inadequate where the child's behavior can be adequately addressed by other means. *See, e.g., E.Z.-L. ex rel. R.L. v. New York City Dep't of Educ.,* 763 F.Supp.2d 584, 596 (S.D.N.Y. 2011).

---

4. Even if Plaintiffs procedural claims were properly raised below, the hearing record demonstrates that (1) the 2008 CSE considered adequate information in creating M.C.'s IEP for the 2008–09 school year; and (2) Plaintiffs had a full and fair opportunity to participate in the creation of M.C.'s IEP for the 2009–10 school year.

■ Plaintiffs allege that M.C.'s IEP was deficient because it lacked a BIP. However, the SRO determined that the IEP contained modifications to address M.C.'s behavior and that a BIP was not necessary. Modifications including verbal cues, manipulative chips to track student questions/comments, a silent signal by teachers, and sticky notes for students to write down their questions were provided to prevent M.C.'s calling out. *Id.* Additional modifications to address M.C.'s impulsivity and other behavioral issues included behavioral contracts, breaks, choices/options regarding instructional activities, a token system, cues, having material broken down, and communication with parents. *Id.* The SRO's factually supported conclusion on this issue is entitled to deference.

### Class Sizes/General Education Environment

Plaintiffs argue that Defendant's recommendation of a general education classroom was inappropriate because he required a small classroom with teachers who are able to meet his significant and complex needs. Specifically, Plaintiffs argue that his anxiety and other social/emotional needs, as well as his pervasive language difficulties, would make it impossible for M.C. to receive a FAPE in a general education environment or in an 8:1:1 special education classroom.

■ The SRO considered Plaintiffs' concerns about the general education environment and special education class size and determined that M.C. could progress in the classes prescribed by the IEP. *Id.* at 21–22. The SRO noted that M.C. would be supported by a team of staff, including a special education teacher and aide during his special education classes, a 3:1 aide during his general education classes, and access to a resource room for individual support. *Id.* The SRO also noted that program modifications specific to M.C. would be sufficient to meet M.C.'s needs in both the general and education environments. *Id.* The SRO considered and rejected Plaintiffs' argument that M.C. could not properly transition in a large, crowded environment based on hearing evidence that M.C. transitioned between classes at Eagle Hill and participated in team sports. *Id.* at 23. Given, the strong preference for educating children to the maximum extent appropriate together with their non-disabled peers, and the SRO's well-reasoned and factually supported opinion, the 2008 IEP's class recommendations are appropriate.

### Failure of Actual Placement to Comply with IEP Recommendations

Finally, Plaintiffs also argue that even if the IEP was valid, the placement actually recommended was incapable of effectively executing the IEP in order to provide M.C. with an appropriate education.

■ Plaintiffs argue that the prototypical schedule and class profiles for the proposed placement differ from the recommendations in M.C.'s IEP and demonstrate that the IEP could not be implemented. Specifically, Plaintiffs argue that (1) the IEP calls for a 3:1 aide but there were five students in the proposed general education classrooms; (2) the District did not demonstrate how the teacher responsible for M.C.'s IEP would address M.C.'s needs; (3) the record reflects that M.C. would not be grouped with similarly functioning peers; and (4) the IEP recommends a daily resource room, whereas the prototypical schedule only provides for a resource room five days out of six days a week.

The SRO rejected each of Plaintiffs' arguments that the actual placement would not substantially comply with the IEP rec-

ommendations. The SRO credited the testimony of the District that M.C. would in fact receive a 3:1 aide. *Id.* at 21–22. The SRO also accepted testimony about modifications that the District regular and special education teachers would make to address M.C.'s needs. *Id.* at 22. Upon examining the hearing record, the SRO found that M.C.'s special education classes were comprised of similarly functioning peers. *Id.* at 23. Each of these findings is well supported by the record and is entitled to deference.

The SRO did not explicitly address Plaintiffs' argument that the proposed placement could only provide a resource room five out of six days of the week. However, "a party challenging the implementation of an IEP must show more than a de minimis failure to implement all elements of that IEP, and instead must demonstrate that the school board or other authorities failed to implement substantial or significant provisions of the IEP." *D.D–S. v. Southold Union Free School District*, No. 09 Civ. 5026, 2011 WL 3919040, at *13 (E.D.N.Y. Sept. 2, 2011) (internal quotations omitted). The failure to provide a resource room for a sixth day is merely such a de minimis failure and does not constitute a denial of FAPE.

## C. Alleged Deficiencies in IEP for 2009–10 School Year

### *Failure to Include Individual Responsible for Implementing IEP in CSE*

■ Plaintiffs allege that the District violated the procedural requirements of the IDEA because they did not include a representative of the District qualified to provide or supervise special education, and who is knowledgeable about the general education curriculum and availability of resources of the school district as required by 8 NYCRR § 200.3(a)(1)(v). Plaintiffs argue that because no one at the CSE

meeting taught at the proposed placement school for M.C., no attendee was responsible for implementing the IEP nor could advise how this setting would be appropriate for M.C.

However, the regulations merely provide that the CSE must include "a representative of the school district who is qualified to provide or supervise special education and who is knowledgeable about the general education curriculum and the availability of the resources of the school district ... The representative of the school district shall serve as the chairperson of the committee." 8 NYCRR § 200.3(a)(1)(v). The 2009 CSE committee chair was the Assistant Director for the School District. She testified that she was responsible for supervising teachers, developing programs, monitoring student progress and chairing CSE meetings, and was a certified special and general educator, reading teacher and school administrator. IHO Hr'g Tr. at 445–46; IHO Decision at 15. Although she did not teach at the proposed placement school, it is clear that the CSE included a member meeting the requirements of 8 NYCRR § 200.3(a)(1)(v). Accordingly, the evidence does not show that the composition of the CSE team rendered the IEP inadequate.

### *Failure to Create Goals that Adequately Address M.C.'s Needs*

■ Plaintiffs allege that M.C.'s 2009–10 IEP was deficient because three of the IEP's reading goals fail to state levels for achievement. The SRO did not specifically address Plaintiffs' contentions regarding the adequacy of three of the 2009 IEP's reading goals. The SRO, however, did specifically recognize that the June 2009 IEP recommended annual reading goals designed to improve the student's ability to compare and contrast characters and events; summarize a story; create graphic

organizers based on reading material; use contextual clues to predict definitions of vocabulary words; answer "wh" questions about stories heard; identify the main idea/details in stories; verbally identify sequences of events in stories; and predict story outcomes. SRO Decision at 26. The SRO found that these goals, including those complained of by Plaintiffs, were satisfactory. *Id.* Further the IEP itself contains evaluation criteria, a procedure to evaluate the goal, an evaluation schedule for each of these goals, and designates that a special education teacher would have the primary responsibility for ensuring that M.C. met those goals. SD Ex. 12. Thus, the evidence does not show that the IEP's reading goals were inadequate.

Plaintiffs also allege that the IEP emotional goals fail to specifically address anxiety, even though this is a major concern for M.C. Plaintiffs contend that of these emotional goals, only one states that it will be worked on with the psychologist, whereas the rest will be worked on by an unidentified "service provider." Again, while not addressing Plaintiffs argument directly, the SRO determined that the June 2009 IEP contained sufficient annual goals to address the student's social/emotional needs. SRO Decision at 26. These included goals to improve M.C.'s ability to apply strategies to foster positive peer relationships; reduce impulsive behavior in class; display awareness and respond appropriately to social cues; and communicate/interact in a socially appropriate manner with peers. *Id.*

Further, in describing M.C.'s social needs, the IEP specifically noted that M.C. was an anxious child, and that M.C. needed to increase coping skills so that his anxiety levels could decrease. SD Ex. 12. Plaintiffs offer no reason why the stated social goals would not also relate to M.C.'s anxiety. Finally, a District witness testi-fied that "service provider" refers to the school psychologist as well as special education teachers and the speech language pathologist. IHO Hr'g Tr. at 458. Given the hearing evidence and testimony, as well as the SRO's well supported conclusion that M.C.'s emotional goals were sufficient, Plaintiffs' arguments are meritless.

### 12:1 Special Education Classroom/ General Education Environment with No Aide

Plaintiffs also argue that Defendant did not demonstrate that M.C. could receive an appropriate education in a 12:1 special education classroom combined with a general education setting with no aide. Plaintiffs contend that M.C.'s issues with anxiety, impulsivity, distractibility, and attention deficits could not properly be addressed in that setting, and that Defendant provided no evidence to explain how they would be addressed.

The IHO agreed that the District provided no justification for the increase in M.C.'s class size, without the support of the classroom aide. IHO Decision at 47. The IHO found that M.C. was not ready for such independence and still required the support of smaller classes and a resource room. *Id.* The SRO, however, disagreed with the IHO and found that specific reasons supported the CSE's decision that M.C. could be educated in a less restrictive environment. SRO Decision at 25. The SRO found that both the parents' reports and testing demonstrated that M.C. made both social and academic progress. *Id.* The SRO also credited evidence that M.C. could follow classroom procedure, did not have difficulty with organizational skills, exhibited an ability to work independently, and never exhibited difficult in changing tasks. *Id.* Based on this evidence, as well as M.C.'s test scores, the SRO found that M.C. could receive an appropriate edu-

cation in the IEP prescribed environment with the aid of modifications. *Id.*

Here, where the SRO has articulated specific reasons for his decision to adopt a different educational policy than the IHO, deference is particularly appropriate. *See M.H.*, 685 F.3d at 244. Contrary to Plaintiffs' contentions, there is no evidence in the record that demonstrates that M.C. would either regress, or could not make progress in the IEP recommended environment. While it is natural to assume that a student would benefit from being in a smaller classroom environment with more support, the IDEA does not require that the District provide an ideal learning environment, but instead only one where the student can progress. *See id.* Additionally, the SRO's determination is consistent with the IDEA'S strong preference for "mainstreaming or educating children with disabilities to the maximum extent appropriate alongside their non-disabled peers." *Id.* Thus Plaintiffs have not demonstrated that the IEP's recommendations would deny M.C. a FAPE.

### Inadequacy of Placement School

Plaintiffs also argue that there was no evidence that the classroom presented at the hearing was the one recommended for M.C, nor how the special education teacher would have specifically modified instruction for M.C. Plaintiffs offer no legal support for their argument that the District was obligated to present evidence of the actual classroom M.C. would have been placed in. Given the Second Circuit's recent pronouncement that a school district may not rely on evidence that a child would have had a specific teacher or specific aide to support an otherwise deficient IEP, it would be inconsistent to require evidence of the actual classroom a student would be placed in where the parent rejected an IEP before the student's classroom arrangements were even made. *See R.E. v. New York City Dep't of Educ.*, 694

F.3d 167, 188 (2d Cir.2012). Here, the District merely presented evidence of how M.C.'s IEP could have been implemented, if Plaintiffs had not unilaterally placed M.C. in Eagle Hill. The District's alleged failure to provide evidence of M.C.'s actual classroom does not constitute a denial of FAPE.

Plaintiffs also argue that the class schedule provided by the District violates M.C.'s IEP because it only offers 45 minutes of mathematics daily instead of one hour. Finally, Plaintiffs argue that M.C. would have to miss a significant amount of music, art, lunch, and recess to receive counseling services. Plaintiffs, however, have not shown that any of these alleged defects would have prevented M.C. from progressing or constituted a "material failure" to implement M.C.'s IEP. *See A.P. v. Woodstock Board of Educ.*, 370 Fed.Appx. 202, 205 (2d Cir.2010) (finding that failure to provide student with aide as mandated in his IEP did not constitute a material failure to implement the IEP).

Because the District offered M.C. a FAPE for both the 2008–09 and 2009–10 school years, the Court need not address the appropriateness of Plaintiffs' unilateral placement of M.C. at Eagle Hill or any possible equitable considerations weighing in Plaintiffs' favor. *See, e.g., Cerra v. Pawling Cent. School Dist.*, 427 F.3d 186, 192 (2d Cir.2005).

## VI. CONCLUSION

Defendant's motion for summary judgment is GRANTED. Plaintiff's motion for summary judgment is DENIED. The Clerk of the Court is directed to enter judgment for Defendant and close this case.

SO ORDERED.